JOINT IMPLANT SURGEONS, INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Joint Implant Surgeons, Inc. v. Commissioner
Docket Nos. 23653-84, 23743-84, 23949-84
United States Tax Court
T.C. Memo 1988-558; 1988 Tax Ct. Memo LEXIS 587; 56 T.C.M. (CCH) 799; T.C.M. (RIA) 88558; December 8, 1988; As amended December 12, 1988 *587 On Sept. 15, 1980, Dr. Thomas Mallory signed a power of attorney, Form 2848. In signing this power, Dr. Mallory did not indicate that he was signing as an officer on behalf of Dr. T. H. Mallory & Associates, Inc. Additionally, a written attachment was not affixed to this power authorizing Dr. Mallory to sign on behalf of his wife, Kelly Mallory, nor was a statement made in the power that Thomas was signing such as a representative of his wife. Held: The power of attorney executed by Thomas Mallory on Sept. 15, 1980, does not operate as a valid power of attorney for Kelly Mallory. The Mallorys purchased tax shelters involving master recordings and art lithographs. Thomas Mallory discussed the purchase of the shelters with Kelly, his wife. Kelly was aware that the couple's 1977 joint tax return reflected losses and credits tied to the recordings shelter and that the couple's low tax liability reported for that taxable year was partly attributable to the couple's claiming losses and credits tied to the shelter. Held further: Kelly Mallory is not an "innocent spouse" as that phrase is defined in sec. 6013(e), I.R.C. of 1954, as amended. The Mallorys operated a farming activity in *588 S corporation form in 1977 and 1978. The Mallorys claimed investment tax credits and expenses tied to this farming activity. Held further: The farming activity represented an "activity not engaged in for profit." In 1977 and 1978, the Mallorys claimed credits and expenses tied to their business use of automobiles. Held further: The Mallorys have not substantiated that they are entitled to greater credits and expenses tied to their business use of automobiles than that determined by respondent. Respondent determined additions to tax under secs. 6651(a)(1) and 6653(a), I.R.C. of 1954, as amended. Held further: These additions to tax are sustained. In an amendment to his answer, respondent asserted the applicability of sec. 6621(c), I.R.C. of 1986, as amended. Held further: Respondent has met his burden of proof; sec. 6621(c) is applicable. Harvey Dunn and Richard A. Barnhart, for the petitioners. Robert J. Kastl, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies and additions to tax for petitioners in the following amounts: Taxable
Additions to Tax
Year
Section
Section
Petitioner
Ended
Deficiency
[2] *589 6651(a)(1) 6653(a)
Joint Implant
2/28/78
$ 19,705.92 $ 777.10
$ 1,252.10
Surgeons, Inc. Thomas H. Mallory
12/31/78
155,268.57
7,763.43
and Sandra Mallory [3] Sandra Mallory 12/31/77
180,688.42
9,034.42
a/k/a Kelly S. Mallory  Furthermore, in motions to amend his answers in docket Nos. 23743-84 and 23949-84, respondent asserted the applicability of section 6621(c) (formerly section 6621(d)) [4] dealing with interest on substantial underpayments attributable to tax motivated transactions. These motions to amend were filed on February 10, 1986, and granted on February 13, 1986. After concessions, [5] *591 *592 *593 the primary issues for our determination are (1) whether a power of attorney signed by Thomas Mallory (sometimes referred to hereinafter as "Thomas" or "Dr. Mallory") on September 15, 1980, operates as a valid power of attorney *590 for Kelly Mallory (sometimes referred to hereinafter as "Kelly") thereby revoking a prior power of attorney executed by Kelly; (2) whether Kelly Mallory is an innocent spouse as defined in section 6013(e) for a portion of the tax deficiency for the taxable year 1977; [6] (3) whether the farming activity conducted by T. H. Mallory & Sons Stock Farms, Inc. ("Stock Farms") [7] during the taxable years 1977 and 1978 represents an activity not engaged in for profit; (4) whether the Mallorys were correct in determining the percentage of business use of two automobiles; (5) whether all petitioners are liable for additions to tax as determined by respondent in the notices of deficiency; and (6) whether the rate of interest imposed on tax deficiencies in docket numbers 23743-84 and 23949-84 should be increased pursuant to section 6621(c). For reasons of clarity and ease of discussion, the findings of fact and opinion tied to each of these issues are presented separately. FINDINGS OF FACT - GENERAL Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Thomas and Kelly Mallory, husband and wife, resided in Pataskala, Ohio, at the time they filed their petitions. They filed joint Federal income tax returns for the taxable years 1977 and 1978. On the couple's 1977 and 1978 returns, Thomas listed his occupation as that of a physician; he specialized in orthopedic surgery. Kelly described *594 herself as a bookkeeper in 1977 and a medical researcher in 1978. On April 9, 1984, respondent issued a statutory notice of deficiency to Kelly Mallory for the taxable year 1977. On April 9, 1984, respondent issued a statutory notice of deficiency to Thomas and Kelly Mallory for the taxable year 1978. Petitioner Joint Implant Surgeons, Inc. ("Joint Implant") is a corporation organized and existing under the laws of the State of Ohio. During Joint Implant's taxable year ended February 28, 1978, Thomas Mallory owned 100 percent of the corporation's stock. Pursuant to an amendment to articles of incorporation filed on March 30, 1977, Joint Implant represents a successor in interest to an earlier incorporated Ohio business, Dr. T. H. Mallory and Associates, Inc. At the time its petition was filed with this Court, Joint Implant had its principal office located in Columbus, Ohio. Joint Implant filed a Federal corporate income tax return, Form 1120, for its taxable year ended February 28, 1978. On April 9, 1984, respondent issued a statutory notice of deficiency to this petitioner for its taxable year ended February 28, 1978. Issue 1. Power of Attorney FINDINGS OF FACT Petitioners *595 Thomas and Kelly Mallory had their 1977 and 1978 joint Federal income tax returns prepared by Medical Management, Inc.Medical Management, Inc. also prepared Joint Implant's income tax return for the corporation's fiscal year ended February 28, 1978. In dealing with Medical Management, Inc., the Mallorys dealt most directly with Mr. Thomas Brock. By 1979, however, the relationship existing between the Mallorys and Mr. Brock had begun to deteriorate. Dr. Mallory first met Norman Morett in 1976 or 1977. At this time Thomas began to look to Mr. Morett for financial advice. [8] *596 During the Mallorys' 1977 and 1978 taxable years, Mr. Morett advised these petitioners to become involved in a number of tax-related transactions. Among these were involvements in tax shelters tied to master recordings and art lithographs. As the relationship between Mr. Brock and the Mallorys deteriorated, the Mallorys began to rely more heavily on Mr. Morett. By 1979, Mr. Morett was not only supplying the Mallorys with financial advice; he was also taking full charge of the accounting aspects of the Mallorys' personal finances and the corporate finances of Joint Implant and Stock Farms. The Service examined the Mallorys' 1977 and 1978 joint income tax returns as related returns to its audit of Joint Implant's corporate return for the company's 1978 taxable year. During the course of the examination of their 1977 and 1978 joint returns, Thomas and Kelly executed a power of attorney -- Form 2848 -- in favor of Mr. Morett. [9] *597 The power was signed by Thomas and Kelly on August 26, 1980, and covered tax matters related to these petitioners' joint returns for the years 1975 through 1979. In a letter dated September 5, 1980, and addressed to "Dr. Thomas H. Mallory," Thomas was informed that the personal income tax returns for 1977 and 1978 were under criminal investigation. The criminal investigation of these personal returns ended in November of 1980. On receiving the September 5th letter, Thomas attempted to reach Mr. Morett. Unable to contact Mr. Morett, Dr. Mallory then called his attorney James Allison. Mr. Allison suggested that the Mallorys hire Robert Zitko and John Dunkel, two attorneys with wide experience in handling tax problems. Mr. Zitko was to handle the criminal aspects of the investigation; Mr. Dunkel was to handle the civil aspects. A September 15, 1980, meeting was arranged between Dr. and Mrs. Mallory *598 and Messers. Zitko, Dunkel, and Allison. On the day of the meeting, however, Kelly was unable to attend. At the meeting Mr. Zitko presented for signature a new Form 2848 which his secretary had prepared at his instruction (sometimes referred to hereinafter as "September 15th Power"). The power identified as taxpayers "Dr. T. H. Mallory & Associates, Inc.," "Mr. Thomas H. Mallory," and "Mrs. Sandra L. Mallory." The power listed as attorneys-in-fact " Robert Zitko" and "John A. Dunkle"(sic). Finally, the power was to cover tax matters related to "personal income tax liability for the years 1977 and 1978." Only Dr. Mallory and Mr. Zitko signed this presented power. Dr. Mallory did not indicate that he was signing as an officer on behalf of Dr. T. H. Mallory & Associates, Inc. A written attachment was not affixed to this power authorizing Dr. Mallory to sign on behalf of his wife, nor was a statement made in the power that Thomas was signing such as a representative of his wife. Mr. Zitko delivered the September 15th Power to Special Agent Anthony Ferris, the Service agent involved in the criminal investigation of the 1977 and 1978 personal returns. Mr. David Metz, the revenue *599 agent investigating Joint Implant's return for its taxable year ended in 1978 and the 1977 and 1978 returns of the Mallorys, knew of the existence of this September 15th Power. Mr. Metz sent the September 15th Power to the Centralized Service Branch of the Internal Revenue Service sometime in November of 1980. In late October of 1980, petitioners Thomas and Kelly Mallory both signed a Form 872, consenting to extend to December 31, 1981, the time to assess tax with respect to the return they filed for the taxable year ended December 31, 1977. This executed form was sent to Agent Metz by Mr. Dunkel on October 29, 1980. A copy of this form was then signed by Lyle Moore, an acting group manager of the Service, and returned to Mr. Dunkel in a letter sent by Mr. Metz and dated October 31, 1980. On November 26, 1980, Mr. Metz sent a letter to Mr. Dunkel. This letter focused on the September 15th Power and suggested alterations to this power. The changes related to Joint Implant. It was noted that the reference to "Dr. T. H. Mallory & Associates, Inc." should be replaced by a reference to "Joint Implant Surgeons, Inc." and that the reference to the personal income tax liability of *600 the Mallorys should be replaced by a reference to the corporate Federal income tax liability of Joint Implant for the corporation's fiscal years ended February 28, 1978, and February 28, 1979. As such, the alterations represented the making of a new power of attorney for the taxpayer Joint Implant. Mr. Dunkel made the requested changes. Through November of 1981, the Mallorys continued to employ the services of Mr. Morett. During this time, Mr. Morett continued to prepare the Mallorys' personal returns and the returns of Joint Implant and Stock Farms. In fact, on October 15, 1980, Mr. Morett signed both Thomas and Kelly Mallory's names to the couple's filed 1979 tax return. Mr. Morett also was named as an attorney-in-fact for Joint Implant and Stock Farms in powers of attorney executed by Thomas Mallory on behalf of these two corporations. Pursuant to these latter powers, Mr. Morett represented the two corporations in a Service examination conducted in New York sometime in the latter part of 1980 and the early part of 1981. On June 23, 1981, Mr. Morett signed two Forms 872 which extended to December 31, 1982, the time to assess tax with respect to the returns Thomas and Kelly *601 filed for their taxable years ended December 31, 1977, and December 31, 1978. In signing these forms on the line labeled "Taxpayer's Representative," Mr. Morett mentioned that he was acting under a power of attorney. On March 8, 1982, Thomas and Kelly Mallory executed Forms 872 extending to June 30, 1983, the period on which tax could be assessed on their return filed for the taxable years ended December 31, 1977, and December 31, 1978. On November 11, 1982, both Thomas and Kelly Mallory executed a power of attorney in favor of Harvey Dunn, Jack Butler, and Richard Barnhart. All three attorneys signed this power of attorney on November 12, 1982. The power covered the Mallorys' individual tax returns filed for the years 1974, 1977, and 1978. Under the grant of authority he received from this November power, Harvey Dunn executed a Form 872 in favor of petitioners on February 19, 1983. This Form 872 covered petitioners taxable years ended December 31, 1977, and December 31, 1978. The form extended the assessment period on each of these returns to the date of December 31, 1983. On November 4, 1983, Harvey Dunn executed other Forms 872 in favor of the Mallorys. Again, Mr. Dunn *602 was acting under the grant of authority he received from the November 11, 1982, power. One of these Forms 872 covered the Mallorys' taxable year ended December 31, 1977, and extended the period to assess on this return to June 30, 1984. In signing this particular form, Mr. Dunn noted that he was signing "as to Sandra Mallory only." The second Form 872 executed by Mr. Dunn on November 4, 1983, covered the Mallory's taxable year ended December 31, 1978, and similarly extended the period to assess on this latter return to June 30, 1984. On April 9, 1984, respondent sent petitioner Kelly Mallory a notice of deficiency tied to the Mallorys' individual tax return filed for the year ended December 31, 1977. Issue 1. Power of Attorney OPINION The first issue we must decide is whether the power of attorney signed by Thomas Mallory on September 15, 1980, operates as a valid power of attorney for Kelly Mallory thereby revoking a prior power of attorney executed by her in favor of Mr. Morett. If we answer this issue in the affirmative, as Kelly Mallory would have us do, then the notice of deficiency sent to Kelly with respect to the Mallorys' 1977 taxable year is invalid because this notice *603 would not have been issued within the extended assessment period as established by these petitioners in their numerous executed Forms 872. See secs. 6501(a) and (c)(4). This affirmative response would be predicated on the fact that the extension signed on June 23, 1981, by Norman Morett as the Mallorys' representative would not be a properly executed extension because Mr. Morett would not be operating under a valid power of attorney. Without this extension signed by Mr. Morett, the chain of Forms 872 relating to the Mallorys' 1977 return breaks and the notice tied to this return would consequently be sent out of time. [10] *604 Section 601.504(b)(1)(ii) of the Statement of Procedural Rules, 26 C.F.R. 601.504 (1988), sets forth the rules for executing a power of attorney by a husband and wife and provides in pertinent part that: (b)(1) a power of attorney * * * must be executed as follows: * * * (ii) Husband and wife. In the case of any taxable year for which a joint return was made by husband and wife, by both husband and wife if both are to be represented by the same representative, except that either spouse may sign for the other if such signature is duly authorized in writing by the other spouse. The instructions accompanying Form 2848 are equally clear in their requirement that in those instances where one spouse is signing on behalf of the other that the signing spouse be operating under a written authorization. The instructions specifically *605 provide, If a joint return is involved, both husband and wife must sign unless one spouse duly authorizes the other in writing to sign for both in which case a copy of the authorization should be attached. It is not required that both husband and wife sign the same power or authorization form. They may execute a separate power of attorney or tax information authorization if they so desire. The rules and instructions are clear in their statement that a power of attorney which is signed by one spouse for the benefit of the other must be signed under a written authorization executed by the other. The September 15th Power in issue in this case was signed only by Thomas. The power was not accompanied by an authorization or statement noting that Thomas was signing the power not only on his own behalf but also on behalf of Kelly as her chosen and authorized representative. With these facts we are inclined to hold that the September 15th Power is not a valid power with respect to Kelly and, therefore, does not revoke the power she signed on August 26, 1980, in favor of Norman Morett. Kelly Mallory, nevertheless, contends that the issue which we now address is similar to, and should *606 be governed by, that faced by courts in deciding whether a valid joint return exists in those instances where only one spouse signs the return. She, nonetheless, cites no cases which directly support her contention. Sections 1.6013-1(a)(2) and 1.6012-1(a)(5), Income Tax Regs., provide that, where a joint tax return is signed by a single spouse, one spouse may sign for the other only if the signing spouse is operating under a power of attorney, a copy of which accompanies the joint return. [11] *608 In spite of the language of these regulations, we have concluded that a failure to comply with these regulations' signing requirements is not fatal for purposes of determining whether a joint return executed by a single spouse is a valid joint return. See Federbush v. Commissioner,34 T.C. 740, 757 (1960), affd. per curiam 325 F.2d 1 (2d Cir. 1963); Howell v. Commissioner,10 T.C. 859, 866 (1948), affd. per curiam 175 F.2d 240 (6th Cir. 1949). Kelly would have us analogously hold that a taxpayer's failure to comply with the signing requirements of exercising a proper power of attorney is not fatal for purposes of our determining whether a valid power exists with respect to that noncomplying taxpayer. *607 In reaching our conclusion that a compliance failure is not fatal in a joint return context, we have stated that the taxpayers' intent in filing a joint return is the primary consideration. Federbush v. Commissioner,34 T.C. at 757. Objective factors which shed light on this intent include the tax return's preparation as a joint return and its containing income and deduction items tied to the nonsigning spouse, Federbush v. Commissioner,34 T.C. at 756; the existence of any reason for the spouses not to file a joint return, Estate of Campbell v. Commissioner,56 T.C. 1, 13 (1971); the prior and subsequent filing history of the spouses, Estate of Campbell v. Commissioner,56 T.C. at 13; Federbush v. Commissioner,34 T.C. at 757; and the nonsigning spouse's action regarding the return subsequent to its filing, Heim v. Commissioner,27 T.C. 270, 274 (1956), affd. 251 F.2d 44 (8th Cir. 1958). Though we acknowledge the wisdom which underlies our decisions focusing on the issue of whether a joint return signed *609 by a single spouse represents a valid joint return, we do not find that such wisdom supports the contention raised by Kelly Mallory. A power of attorney and an income tax return are fundamentally different documents, each possessing a distinct nature and serving a separate function. An income tax return is a statutorily mandated, unilateral report containing necessary information from which the government can properly determine amounts owed it. As such, the return is designed to address most specifically the interests and needs of the government. In contrast, a power of attorney is "an instrument in writing by which one person, as principal, appoints another as his agent and confers upon such agent the authority to act in the place of the principal for the avowed purposes set forth in the instrument." 2A C.J.S., Agency, sec. 44 (1972). A power is thus an agreement establishing an agency relationship to which the Federal government, in the case at hand, is an outsider. The power serves most directly the interests and needs of its maker, the principal. As the precedent to which Kelly Mallory would have us turn proffers us slight guidance in our resolution of the instant issue, *610 we must examine that law defining the consequences attendant to the establishment of an agency relationship to resolve the issue before us. In so doing, we deem it appropriate to briefly mention those facts which are of greatest importance to us in our examination. First, as we have previously mentioned, Thomas Mallory, in signing the September 15th Power, which was delivered to respondent, never suggested in any way that he was acting on behalf of his wife. Second, in spite of the September 15th Power, Norman Morett continued to perform important duties on behalf of both Thomas and Kelly Mallory through November of 1981. He prepared these two petitioners' joint personal tax returns and the returns of Joint Implant and Stock Farms. On October 15, 1980, a month after the September 15th power was executed, he signed each of the Mallorys' names to the couples' 1979 joint return. He represented Joint Implant and Stock Farms in a Service examination conducted in late 1980 and early 1981. And at least until the date of his termination in November of 1981, Mr. Morett continued to represent both Thomas and Kelly Mallory as their attorney-in-fact with regard to these petitioners' taxable *611 years ended in 1975, 1976, and 1979. Third, on his signing the Form 872 which extended to December 31, 1982, the time to assess tax with respect to the Mallorys' 1977 return, Mr. Morett acknowledged that he was acting under a power of attorney. Fourth, after Mr. Morett signed this Form 872, both Thomas and Kelly Mallory executed a Form 872 further extending to June 30, 1983, the period to assess tax on their 1977 return. Fifth, neither Thomas nor Kelly have come forward with any substantiated evidence suggesting that Mr. Morett was aware of the September 15th Power or that he had been informed that his responsibilities with regard to these petitioners' 1977 and 1978 returns had been extinguished. Sixth, in signing the September 15th Power, Thomas was acting on the legal advice of counsel well-versed in matters of Federal tax law. Finally, as is apparent from the evidence in this case, the Mallorys did not begin to question the authority of Mr. Morett to execute the two Forms 872 he signed on June 23, 1981, until sometime later when Mr. Dunn signed such a form "as to Sandra Mallory only." These facts lead us to the conclusion that, when Mr. Morett signed the June 23, 1981, Form *612 872, respondent, a third person, was justified in believing that Mr. Morett was acting for Kelly Mallory under an existing power of attorney. Under the law of agency, perceptions of third persons are quite important. If the agent, whether actual or apparent, is acting within the scope of his perceived duties and third parties look to such actions, then the principal is bound by the agent's actions until such time as the agency relationship is clearly terminated. See 2A C.J.S., Agency, § 20 (1972). [12] Additionally, a principal's long silence in disputing the actions of an alleged agent suggests that the principal has acquiesced in the consequences of the actions. See 2A C.J.S., Agency, § 56 (1972). In the instant case, the power to correct any perceived problems tied to Mr. Morett's employment as an attorney-in-fact on behalf of Kelly Mallory rested in Kelly's hands. She easily could have executed a new power of attorney which terminated Mr. Morett's powers. She also should have notified Mr. Morett that, with respect to the taxable years 1977 and 1978, she specifically intended to terminate his authority and did not want him *613 to act on her behalf thereafter. She, however, failed to do these simple things. These failures occurred while she employed legal counsel well-versed in tax matters. The result of her failures is that Mr. Morett was properly perceived to be her agent; and his actions, therefore, were binding on her. [13]
Kelly must accept the consequences of her own actions, or in actions as the case might be. [14]Kelly may not argue that mistakes, errors, or bureaucratic slip-ups on the part of respondent relieve her of her obligation to handle responsibly her own matters. The September 15th Power signed only by Thomas Mallory, consequently, is not a valid power exercised on Kelly Mallory's behalf. The notice of deficiency addressed to Kelly Mallory was timely sent. Issue 2. Innocent Spouse FINDINGS OF FACT On their 1977 joint Federal income tax return, petitioners Thomas and Kelly Mallory claimed $ 426,918 in income tied to wages and salary. This wage and salary sum represented the largest percentage by far of these petitioners' total income. Their total income, line 21 of their Form 1040, *614 equalled $ 146,865. To arrive at this total income figure, these petitioners claimed a Schedule C loss in the amount of $ 266,849 and a Schedule E loss in the amount of $ 24,933. The Mallorys' 1977 adjusted gross income equalled $ 146,865. From this adjusted gross income figure, Thomas and Kelly deducted $ 82,341 in itemized deductions to arrive at a taxable income figure of $ 64,524. The tax calculated on this taxable income amount equalled $ 20,667, which tax these petitioners reduced to $ -0- by the claiming of an investment tax credit equal to the calculated tax. The Mallorys then determined that a tax in the amount of $ 1,873 was owing as a result of their recomputation of a prior year's investment tax credit. With this recomputation's resulting tax, the Mallorys' self-assessed tax liability for 1977 totalled $ 1,873. These petitioners' 1977 Schedule C loss directly related to an acquisition of two master recordings -- The Lee Konitz Quintet and Fats Waller Heavenly Jive. Additionally, the investment tax credit claimed on the Mallorys' 1977 tax return was based in part on the acquisition and placing in service of these two master recordings. The Schedule E loss on the 1977 *615 return reflected losses from Stock Farms and from rental real property owned by petitioners. In claiming the Schedule C loss tied to the acquisition of the master recordings, both Thomas and Kelly Mallory listed themselves as proprietors in the music business. Furthermore, both these petitioners' names appeared on Form 3468, the form used in the computation of the recordings' investment tax credit. The acquisition papers tied to the master recordings were in Thomas Mallory's name. Thomas also wrote the checks which represented the initial investment in the recordings. However, the Mallorys' income, of which amount Kelly was fully cognizant, was deposited in accounts on which Kelly could equally draft checks. Norman Morett advised both Thomas and Kelly Mallory concerning the purchase of the master recordings tax shelter. Thomas also discussed with Kelly all their family's finances. Thomas actively sought Kelly's approval with regard to financial and tax matters; and, in fact, both of these petitioners extensively discussed between themselves the wisdom and decision to acquire the recordings. Kelly additionally discussed the recordings' purchase with Mr. Fodey, Joint Implant's office *616 manager. Finally, Kelly was aware that the couple's 1977 return reflected the Schedule C loss and investment tax credit tied to the master recordings and that the couple's low tax liability reported for that year was due in part to the recordings tax shelter. Within three years prior to the date of the trial of this case, February 10, 1986, Kelly sold a condominium which was listed in her name and was located in Daytona Beach, Florida. [15] The condominium had been used by the Mallorys and rented to close acquaintances. The decision to purchase the beach property was that of Thomas Mallory. In 1982, Joint Implant paid Kelly Mallory a salary of $ 31,725. Kelly's separate income in 1983 is not in evidence, however. Additionally, the Mallorys' 1983 income is not in evidence. The parties stipulated that the *617 Mallorys are not entitled to the full Schedule C loss which they claimed on their 1977 return and which related to the master recordings tax shelter. The parties additionally stipulated that these two petitioners are "not entitled to compute an investment tax credit on the amount of $ 470,000 arising by reason of the acquisition and alleged placing in service of [the] master recording[s]." Issue 2. Innocent Spouse OPINION As a general rule, a husband and wife are jointly and severally liable for any tax or deficiency owed on a joint return. Sec. 6013(d)(3); Davenport v. Commissioner,48 T.C. 921, 926 (1967). Therefore, the entire tax liability on a joint return may be assessed against either spouse. Davenport v. Commissioner, supra.In the case at hand, however, the statutory period has expired during which a deficiency can be assessed against Thomas Mallory with respect to the Mallory's 1977 taxable year. Respondent's sole recourse then in his attempt to assess a deficiency against the Mallorys for this year lies in his proceeding against Kelly Mallory only. As we have previously decided, this action on respondent's part is proper. In an attempt to limit her liability for taxes *618 due on the couple's 1977 tax return, Kelly argues that, with respect to those deficiency items, including interest and additions, appearing on the notice she received for the couple's 1977 taxable year and relating to the master recordings tax shelter, she is an innocent spouse within the meaning of section 6013(e). [16]Section 6013(e), as amended by the Tax Reform Act of 1984, Pub. L. 98-369, sec. 424(a), 98 Stat. 801-802, [17] *620 provides that in order to obtain innocent spouse relief, the taxpayer must show (1) that a joint return has been made for a taxable year; (2) that on such return, there is a substantial understatement of tax attributable to grossly erroneous items of the other spouse; (3) that he or she did not know and had no reason to know of such substantial understatement when he or she signed the return; and (4) that after a consideration of all facts and circumstances, it would be inequitable to hold him or her liable for the deficiency in income tax attributable to such substantial understatement. See sec. 6013(e)(1); Purcell v. Commissioner,86 T.C. 228, 235 (1986), affd. 826 F.2d 470 (6th Cir. 1987). A substantial understatement, for purposes of the innocent spouse provisins, *619 means any understatement which exceeds $ 500. Sec. 6013(e)(3). Grossly erroneous items are defined, in pertinent part, as "any claim of deduction, credit, or basis by [the spouse not claiming innocent spouse relief] in an amount for which there is no basis in fact or law." Sec. 6013(e)(2). If the substantial understatement is attributable to such grossly erroneous items (as opposed to omitted gross income), then the liability in respect of which the alleged innocent spouse seeks to be relieved must exceed a specified percentage of such spouse's adjusted gross income for the year preceding the year in which the notice of deficiency is mailed. Sec. 6013(e)(4). It is the taxpayer who bears the burden of establishing the requirements of section 6013(e). Adams v. Commissioner,60 T.C. 300, 303 (1973); Sonnenborn v. Commissioner,57 T.C. 373, 381-383 (1971); Rule 142(a). A failure to establish any one of these requirements will prevent the taxpayer from qualifying for relief. Purcell v. Commissioner,826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986); Shea v. Commissioner,780 F.2d 561, 565 (6th Cir. 1986), affg. in part and revg. in part a Memorandum Opinion of this Court. In the instant case, the Mallorys filed a joint return for 1977. Additionally, a substantial understatement of tax attributable to the recordings shelter exists. Sec. 6013(e)(3). Respondent, however, argues that Kelly Mallory has not shown: that the understatement is attributable to grossly erroneous items of one spouse; that she did not know, and had no reason to know, of the existence of the substantial understatement; that it would be inequitable to hold her liable for the deficiency attributable to the understatement; and that *621 she met the income qualifications of section 6013(e)(4). To resolve this factual innocent spouse issue, [18] we focus most of our attention on whether Kelly had no reason to know of the existence of a substantial understatement attributable to the recordings shelter. We note that the standard to be applied in this focus is directed toward what a reasonable person in Kelly's circumstances could have been expected to know at the time the return was executed. Sanders v. United States,509 F.2d 162, 166-167 (5th Cir. 1975); Terzian v. Commissioner,72 T.C. 1164, 1170 (1979); see also Shea v. Commissioner,780 F.2d at 565-566. ("The primary ingredients of the 'reason to know' tests are (1) the circumstances which face the [taxpayer]; and (2) whether a reasonable person in the same position would infer that omissions or erroneous deductions had been made.") [19]
Facts defining the circumstances which faced Kelly at the time the couple executed their joint 1977 tax return were that Kelly was advised by *622 Norman Morett about the recordings' purchase, that she discussed the purchase with both her husband and Mr. Fodey, that she was aware that the couple's 1977 return reflected losses and credits tied to the recordings shelter, and that she knew that the claiming of those losses and credits was partly responsible for the couple's low tax liability reported for that taxable year. In fact, the Schedule C losses and investment tax credit which related to the recordings shelter and which the Mallorys claimed on their 1977 return were substantially responsible for the couple's reporting only $ 1,873 in tax liability on an initially reported wage and salary income figure for that taxable year in excess of $ 425,000. This reported tax liability represented less than one-half of one percent of the Mallory's 1977 wage and salary income. [20]
These facts lead us to conclude that, in signing a return identical to that which the Mallorys executed for their 1977 taxable year, a reasonable person in the same position as Kelly Mallory would be inclined to question seriously the *623 return's reported tax liability and would infer that the return contained erroneous deductions. The consequence of our conclusion is that Kelly does not qualify for innocent spouse relief under section 6013(e). At trial Kelly stated that her role at the meetings in which the recordings shelter's purchase was discussed was insignificant, that she did not have specific knowledge about the shelter's technicalities, that her husband had made the final decision concerning the recordings' purchase, and that she disagreed with the purchase because she distrusted Mr. Morett's advice. These statements, however, do not convince us that Kelly had no reason to know of the existence of a substantial understatement attributable to the purchase of the recordings and traceable to the couple's 1977 taxable year. Each of these statements in no way lessens the fact that Kelly had been told of the recordings' investment and had signed the couple's 1977 joint tax return knowing full well that the important tax consequences leading from the shelter's purchase were reflected in the reportedly low tax liability appearing on that return. Moreover, Kelly's stated mistrust of Mr. Morett's advice lends support *624 to a conclusion that a reasonable person in her shoes would have inferred that the couple's 1977 return was subject to question and contained erroneous deductions. Were Kelly sincerely concerned about the inadvisability of investing in the recordings shelter, this concern could have easily been displayed through the simple expedient of her filing her own separate tax return for 1977 on which she would have claimed no tax benefits tied to the shelter's purchase. Having already decided that Kelly may not claim the benefits of section 6013(e), we make two passing remarks. First, we note that section 6013(e)(1)(B) emphasizes that the substantial understatement of tax must be attributable to grossly erroneous items of one spouse. In reporting on their 1977 return the losses and credits tied to the recordings, however, both Mallorys were listed as proprietors in the music business. This listing, along with facts concerning the account from which funds were drawn to purchase the master recordings, suggests that in substance the purchased recordings were the joint property of both spouses. Second, in petitioners' reply brief, Kelly Mallory goes to great lengths to show that she meets *625 the income specifications of section 6013(e)(4). [21] *626 *627 *628 This showing seems superficially convincing. However, it rests on an unjustified shifting to respondent of the burden of going forward with evidence. Respondent elicited testimony at trial that the condominium sale might have occurred in the preadjustment year. In meeting her burden of proof with regard to her qualification as an innocent spouse, therefore, Kelly then bore the responsibility of going forward with evidence to show that the sale had not occurred during this year or if so the gain thereon. Cf. Adams v. Commissioner,60 T.C. at 303; Sonnenborn v. Commissioner,57 T.C. at 381-383. Kelly made no such showing. Furthermore, that Mrs. Mallory is compelled to substantiate her meeting the income specifications of section 6013(e)(4) by relying on a detailed mathematical analysis appearing in petitioners' reply brief only highlights her obvious failure to produce any direct evidence tied to her income level for the preadjustment year. Such failure weighs heavily against petitioner. Cf. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). Issue 3. Farming Activity -- Activity Engaged for Profit? FINDINGS OF FACT Stock Farms is a small business corporation which was incorporated in Ohio on May 16, 1977. Stock ownership in the corporation rested solely in the hands of the Mallorys during *629 1977 and 1978. Stock Farms represented the incorporation of a farming activity which Thomas and Kelly had originally operated as a sole proprietorship. Losses from their farming activities which these two individuals claimed on their joint income tax returns for the years 1973 through 1982 are as follows: Year
Loss
1973
($ 5,025.38)  1974
($ 3,840.07)  1975
($ 8,570.60)  1976
($ 8,538.32)  1977
($ 9,845.36)  1978
($ 19,648.74)
1979
($ 39,472.00)
1980
($ 68,836.00)
1981
($ 89,666.00)
1982
($ 47,373.00)
On their 1977 joint Federal income tax return, Thomas and Kelly Mallory claimed $ 3,135.09 as their distributive share of qualified investment property acquired and placed in service by Stock Farms during taxable year 1977. On their 1978 joint Federal income tax return, the couple claimed $ 5,261.30 as their distributive share of qualified investment property acquired and placed in service by Stock Farms during taxable year 1978. The Mallorys conducted their farming activities on 248 acres of land located adjacent to their personal residence. Prior to 1977, however, this land had remained essentially unutilized in spite of these petitioners claiming in prior taxable years losses tied to their farming *630 activities on the land. In 1977, Thomas and Kelly decided to raise and breed black angus cattle. For this purpose, they devoted about 40 of the 248 acres to pasture land. In this same year, an additional portion of the couple's 248 acres was used to grow corn and soybeans. In deciding to raise and breed cattle, the Mallorys were acting on the advice of one of their neighbors who was a veterinarian. This veterinarian suggested that the Mallorys buy four cows from him. The cows which the Mallorys purchased had just been bred and, while in these petitioners' possession, gave birth to a number of steers. The young steers were subsequently sold at public auction. In the Mallory's next attempt at breeding the cows, two of the four animals died. Discouraged by their mishaps in breeding cattle, the Mallorys acted on the advice of Dr. Mallory's younger brother and decided to raise standard bred horses instead. To this end, the couple purchased in 1978 three mares that were with foal. The mares gave birth, and the progeny were thereafter sold. As time continued, the couple purchased more mares and an expensive stallion. In 1985, the Mallory's farming and breeding activity generated *631 its first profit. Thomas and his family used some of the purchased horses for personal purposes. Thomas Mallory also enjoyed fox hunting, a sport requiring the use of a horse. Under a lease approved by Joint Implant's directors, Joint Implant rented a horse from Stock Farms for the use and enjoyment of the company's employees. In actuality, however, the horse rented by Joint Implant was used by Thomas in fox hunts. On a depreciation schedule attached to its 1978 Form 1120S, U.S. Small Business Corporation Income Tax Return, Stock Farms noted the date of its acquisition of certain properties and the costs of these properties. These properties and their corresponding acquisition dates and costs are listed as follows: Property
Date Acquired
Cost
Signs
6/77  $ 653.33  Cattle - Breeding
5/77  1,200.00
Equipment
6/77  1,065.00
Fence
6/77  216.76
Equipment
4/77  5,681.29
Ford Tractor
4/77  2,519.37
Home
6/77  515.00
[22] Asphalt 9/78  5,842.00
Landscaping
9/78  10,180.94
Equipment
12/78  1,861.30
Tractor
5/26/78
3,400.00
Horse
9/78  1,350.00
Additionally, on this same return, Stock *632 Farms reported $ 2,317 in income items and claimed the following deductions: Utilities
$ 236.66   Livestock Allowances
70.73
Wages/Salaries
1,040.00
Payroll Taxes
33.56
Equipment and Truck
2,545.84
Repair Expenses Farm Supplies (Saddlery
703.88
& Supplies) Bank Charges
36.88
Auditing & Management
916.00
Expense Painting
61.76
Veterinarian
118.00
Maintenance
320.03
Miscellaneous
113.30
Feed & Fertilizer
2,319.03
Horse Shoeing
375.00
Horse Boarding & Care
2,515.15
Truck & Equipment Lease
6,842.00
Amortization
126.52
Depreciation
3,467.76
Other Taxes
124.44
OPINION Respondent disallowed the Mallory's distributive share of loss for taxable years 1977 and 1978 from Stock Farms because he contends that these petitioners did not show that the losses were incurred in a trade or business or in an activity engaged in for profit, or with respect to property held for the production of income. Respondent additionally disallowed these same petitioners' distributive share of qualified investment property from Stock Farms for taxable years 1977 and 1978 because he contends that these petitioners did not show that the property qualified as property subject to investment credit. The Mallorys, to the contrary, submit that their reporting *633 of these 1977 and 1978 items was proper. We must decide, for the years in issue, whether the farming activity of Stock Farms constituted an"activity not engaged in for profit," pursuant to section 183. Section 183 provides that, except as otherwise provided for in that section, taxpayers will not be allowed deductions incurred in an activity "not engaged in for profit." The losses claimed by petitioners are, therefore, allowable in full only if petitioners' motivation in investing in the farm was to make a profit. Whether an activity is engaged in for profit turns on whether the taxpayer has a bona fide objective of making a profit. Dreicer v. Commissioner,78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Engdahl v. Commissioner,72 T.C. 659 (1979). The taxpayer's objective is a question of fact to be determined from all facts and circumstances in the record. Allen v. Commissioner,72 T.C. 28 (1979). The burden of proof is on the taxpayer with greater weight given to objective facts rather than to the taxpayer's mere statement of intent. Engdahl v. Commissioner, supra;sec. 1.183-2(a), Income Tax Regs.
The regulations under section 183 list the following *634 nine factors which should normally be taken into account in determining whether an activity is engaged in for profit: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, that are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation involved in the activity. Sec. 1.183-2(b), Income Tax Regs.
These factors are not exclusive and are to be applied according to the unique facts of each case. Sec. 1.183-2(b), Income Tax Regs. Accordingly, no one factor, nor a majority of the nine factors, need be considered to be determinative. Golanty v. Commissioner,72 T.C. 411, 426-427 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981). In looking to the factors as they pertain to the case before us, we first *635 note that neither of the Mallorys brought forward evidence which would suggests that either one of them had taken an active role in handling the mundane tasks of running a successful farm. In fact, when asked to describe his typical day, Thomas replied as follows: Well, I've always been kind of a work-alcoholic. I get up at 3:00 o'clock in the morning and I go to the hospital at 4:00. I live way out in the country so it takes me about an hour to get to work. So I get to the office about -- I'm sorry, the hospital about 5:00 in the morning. Then I usually have -- I have an enormous practice, so about 50 patients in the hospital. So I go around with my entre of assistant doctors and I see all these patients and then we go to the operating room and will perform six to eight of these operations before noon; and then will see somewhere between 30 and 40 patients; and then I'll have a whole stack of phone calls dealing with patients. And meanwhile then, I'm doing these papers and writing the research for these meetings I go to. And would drive home somewhere around 8:00 o'clock; have dinner with my wife and my children; and fall asleep at about 9:00 o'clock. And this scenario has *636 gone on continuously for the last 15 years. Nowhere in this description does Thomas mention that he applied any of his time and efforts to the operation of the farm. And, indeed, with such constraints on his time as mentioned in his description, it would appear near impossible for him to take part in any daily activities associated with the farm's operation. In lieu of his own participation and that of Kelly, Mr. Mallory testified that he employed Mr. Dale Williams to work at the farm on a daily basis. Mr. Williams, however, was never introduced as a witness to corroborate Dr. Mallory's testimony. Additionally, Stock Farms' Form 1120S for 1978 reveals that the company paid in wages and salaries only $ 1,040. Such a low salary figure does not corroborate Dr. Mallory's testimony that Mr. Williams was employed at Stock Farms on a daily basis. Our examination of some of the assets used in the farm reveals a further oddity. Stock Farms states on its 1978 return that it paid $ 1,200 for cattle purchased in 1977 and $ 1,350 for horses purchased in 1978. These assets clearly represent the core of Stock Farms' presumed breeding activities. However, on this same return Stock Farms lists *637 payments of $ 10,180.94 for landscaping to the farm which was completed in 1978 and $ 5,842 for asphalt used by the farm in 1978. At trial Thomas admitted that the asphalt was used to build a driveway that went past the Mallorys' barn to their house. We consider it inconsistent that, in an attempt to make their farm a profitable breeding venture in 1977 and 1978, the Mallorys would feel compelled to spend comparatively small amounts for breeding animals and comparatively large amounts on such cosmetic trappings as asphalt driveways and landscaping. We additionally point out the Mallorys' farm activity continually generated fairly substantial losses through at least 1982 and that the farm did not generate its first profit until 1985. The Mallorys argued on brief that, though their farming activity generated losses for quite sometime, the couple attempted to reduce such losses by changing their breeding activities. The Mallorys' decision to move from the breeding of cattle to the breeding of horses was ostensibly based on the advice of supposed farm experts. However, none of these alleged experts appeared as witnesses; consequently, we did not have the independent opportunity to *638 assess their expertise. The Mallorys failed to produce books and records that demonstrate that the couple was aware of the costs tied to their farming activity and were attempting to keep such costs under control. Furthermore, these petitioner's evidence in support of their position primarily consisted of self-serving statements. Corroborating testimony from others was not forthcoming. As we have mentioned numerous times beforehand, we need not accept unquestionably the self-serving testimony of a taxpayer. See Geiger v. Commissioner,440 F.2d 688, 689-690 (9th Cir. 1971), affg. per curiam a Memorandum Opinion of this Court; Sharwell v. Commissioner,419 F.2d 1057, 1060 (6th Cir. 1969), affg. on this issue a Memorandum Opinion of this Court; Tokarski v. Commissioner,87 T.C. 74, 77 (1986). Moreover, we view with suspicion the failure of a taxpayer to produce the testimony of critical absentee witnesses. Pollack v. Commissioner,47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968); Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). We finally note that the Mallorys' raising of horses certainly had a personal aspect *639 to it. In fact, the Mallorys' personal use of the farm's horses, especially Thomas' use of one of the horses in fox hunts, explains much of the costs associated with Stock Farms' expensing of items, such as horse shoeing, horse boarding and care, saddlery, and feed. For the years in issue then, these petitioners' personal use of the horses appears to have predominated their decision to operate a horse breeding activity. In sum, we find that, for the years in issue, the farming activity did not represent an activity engaged in for profit and that the Mallorys additionally are not entitled to the tax credits which they claimed in 1977 and 1978 and which related to assets used in their farming activity. Flowers v. Commissioner,80 T.C. 914, 931 (1983); Pike v. Commissioner,78 T.C. 822, 841-842 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984). Issue 4. Automobile Expenses and Credits FINDINGS OF FACT During the course of a day, Thomas drove from his home to his medical office and a number of hospitals. In the evening he drove home once again. In 1977 and 1978, however, he did not maintain a log reflecting his business use of any automobile while at work. The *640 Mallorys also drove for pleasure purposes. On their 1977 and 1978 returns the couple claimed expenses and investment tax credits for local transportation tied to the business use of their automobiles. Respondent disputed these petitioners' claiming a large portion of these expenses and credits. OPINION An automobile log was presented at trial which supposedly reflected Thomas Mallory's business use of an automobile. At trial, Thomas admitted that he had not prepared the presented log nor had he ever seen it. Furthermore, the Mallorys produced no corroborating evidence regarding Kelly Mallory's business use of any automobile. We, thus, find that the Mallorys have only their own self-serving testimony in support of their claimed automobile deductions and credits. We need not unwaveringly accept such self-serving testimony. [23] See Geiger v. Commissioner,440 F.2d at 689-690; Sharwell v. Commissioner,419 F.2d at 1060; Tokarski v. Commissioner,87 T.C. at 77. On *641 brief, the Mallorys argue that, in determining these petitioners' entitlement to expenses and credits for local transportation tied to their business use of automobiles, we should apply the rule of Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). The Cohan rule applies in those instances where the taxpayer has shown that he is entitled to an allowable expense whose exact amount is indeterminate or not fully substantiated. When the rule applies, the Court then looks to the record to find sufficient evidence on which it can base its estimate of an allowable expense amount. Where, however, the record provides no evidence of an allocable amount, the claimed deduction must be disallowed. Professional Services v. Commissioner,79 T.C. 888, 919-920 (1982); Luman v. Commissioner,79 T.C. 846, 859 (1982); Epp v. Commissioner,78 T.C. 801, 807 (1982). The Cohan rule does not apply as a ramrod to allocate to a taxpayer expense deductions in excess of those amounts for which sufficient, corroborating evidence exists where the taxpayer neither presents easily-obtainable corroborating evidence which would justify a higher allocation nor proffers an explanation for such evidence's nonpresentation. *642 [24] In this case, no credible evidence exists in the record on which we can base an estimate of allowable expense and credit amounts greater than those determined by respondent in the notices of deficiency relating to the couple's 1977 and 1978 taxable years. The Cohan rule is, thus, inapplicable. The Mallorys bear the burden of proof in arguing that they are entitled to greater amounts than those determined by respondent. Welch v. Helvering,290 U.S. at 115; Rule 142(a). These petitioners have failed in this regard. Consequently, we fully sustain respondent's determination with respect to this issue. Issue 5. Additions to Tax - Sections 6651(a)(1) and 6653(a)
FINDINGS OF FACT All petitioners in this case had their returns prepared for the years in issue by Medical Management, Inc. Deductions claimed by petitioner Joint Implant on its return for its taxable year ended February 28, 1978, for professional entertainment and gifts, depreciation on a security system installed in the Mallorys' home, and meal allowances were conceded by this petitioner as not being deductible. In 1977 and 1978, petitioners Thomas and Kelly Mallory claimed *643 deductions with respect to the swimming pool located at this couple's personal residence. OPINION Respondent determined additions to tax under sections 6651(a)(1), and 6653(a). The burden of proof is on taxpayers to establish that these additions to tax are not applicable. Neubecker v. Commissioner,65 T.C. 577, 586 (1975); Enoch v. Commissioner,57 T.C. 781, 802 (1972). Section 6651(a)(1) imposes an addition to tax not exceeding 25 percent in the aggregate in the case of failure to file returns, unless it is shown that such failure is due to reasonable cause and not due to willful neglect. Petitioner Joint Implant presented no evidence to meet its burden of proof. The addition to tax under section 6651(a)(1) is sustained. See Cupp v. Commissioner,65 T.C. 68 (1975), affd. in an unpublished opinion 559 F.2d 1207 (3d Cir. 1977); Jarvis v. Commissioner,78 T.C. 646 (1982). Section 6653(a) provides for additions to tax if any part of the underpayment is due to negligence or an intentional disregard of rules or regulations. If this section applies, then its addition to tax is calculated on the basis of the entire underpayment of tax. Commissioner v. Asphalt Products Co., 482 U.S. *644 (1987). All petitioners argue that section 6653 is inapplicable in their individual cases because each relied on the advice of Medical Management, Inc. This excuse rings hollow when we note the egregious character of some of the deductions claimed by these petitioners during the years in issue. The Mallorys were claiming depreciation deductions on their swimming pool; Joint Implant was claiming depreciation deductions on a security system installed in the Mallory's home. Section 262 is clear in its disallowance of deductions tied to personal expenses. That petitioners would blindly accept the advice of Medical Management, Inc. that such inherently personal items were properly depreciable is unfathomable. [25]
Petitioners have failed to introduce any evidence to carry their burden of proof. Moreover considering the evidence before us, we find that petitioners have intentionally disregarded rules and regulations of the Internal Revenue Code and have been negligent. We sustain the additions to tax under section 6653(a). Issue *645 6. - Section 6621(c)
FINDINGS OF FACT At the advice of Norman Morett, Thomas and Kelly Mallory invested in tax shelters during the taxable years 1977 and 1978. The tax shelters involved master recordings and art lithographs. With regard to the master recordings, these petitioners claimed on their 1977 and 1978 returns, depreciation in the respective amounts of $ 270,000 and $ 67,500. The basis the Mallorys used for purposes of calculating depreciation and an investment tax credit tied to the recordings was $ 470,000. A nonrecourse promissory note in the amount of $ 350,000 and with an annual interest rate of six percent was secured by the recordings. The recordings never generated a profit because few, if any, recordings were ever sold. The true fair market of the recordings was no more than $ 13,500. With regard to the art lithographs, the Mallorys claimed deductions in the amount of $ 82,872.26 in 1978. The basis the Mallorys used for purposes of calculating depreciation and an investment tax credit tied to the lithographs was $ 655,000. Nonrecourse promissory notes in the amounts of $ 149,500, $ 147,500 and $ 291,500 and with annual interest rates of eight percent were secured *646 by the art lithographs and proceeds from the use and exploitation of these lithographs. The lithographs investment never generated a profit because few, if any lithographs, were ever sold. The true fair market value of all lithographs purchased was $ 0. In 1977 and 1978, the farming activity represented an "activity not engaged in for profit" as that phrase is defined in section 183. OPINION In a motion to amend his answers in docket numbers 23949-84 and 23743-84, respondent asserted the applicability of section 6621(c). Respondent argued that the Mallorys' investment in the master recordings and art lithographs and the couples' farming activities in 1977 and 1978 qualified as "tax motivated transactions." Since respondent asserts this addition to tax by amendment to his answer, he has the burden of proof. Zirker v. Commissioner,87 T.C. 970, 981 (1986); Parker v. Commissioner,86 T.C. 547, 566 (1986); Rule 142(a). Section 6621(c) applies to interest accruing after December 31, 1984, even though the transaction was entered into prior to the date on which section 6621(c) was enacted. Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). *647 The section provides for an increased rate of interest for substantial underpayments attributable to a tax motivated transaction. A substantial underpayment is defined as an underpayment which is attributable to one or more tax motivated transaction and is in excess of $ 1,000. Section 6621(c)(2). Section 6621(c)(3)(A) generally prescribes the types of transactions which are considered "tax motivated transactions." Under section 6621(c)(3)(A)(i) a "tax motivated transaction" includes any valuation overstatement within the meaning of section 6659(c). Additionally, section 6621(c)(3)(B) authorizes the Secretary by regulation to specify additional types of transactions which will be treated as tax motivated transactions. Section 301.6621-2T, Q and A-4, Temp. Proced. & Admin. Regs., 49 Fed. Reg. 50391 (Dec. 28, 1984), states that any deductions disallowed for any period under section 183 are considered to be attributable to a tax motivated transaction. Section 301.6621-2T, Q and A-10, of the same regulation states that the increased interest rate under section 6621(c) applies to interest accruing on a deficiency after December 31, 1984, attributable to tax motivated transactions *648 including those described in A-4 of the regulation. Under section 6659(c) a valuation overstatement exists "if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)." Sec. 6659(c). The Mallorys on the their returns for 1977 and 1978 listed values for their purchased recordings and lithographs which exceeded by more than 150 percent the true value of these properties. These valuation overstatements consequently qualify as tax motivated transactions. As an aside, we also find that the Mallorys' investments in the recording and lithograph tax shelters represented investments in section 183 activities, that is, investments in "activities not engaged in for profit." The Mallorys devoted none of their time or effort to insure the success of these investments. The investments generated only substantial losses; no true objective of profits tied to the ventures was demonstrated by the Mallorys. Because of this finding, we have further cause to label the recording and lithograph investments as tax motivated transactions. We *649 have also found that the Mallorys' farming activity in 1977 and 1978 represents an "activity not engaged in for profit" as that phrase is defined in section 183. The deductions relating to the farming activity are therefore attributable to a tax motivated transaction. The underpayments in tax attributable to the just mentioned farm activity tax motivated transaction easily exceed $ 1,000. Thus, we find the Mallorys liable under section 6621(c) for increased interest on their substantial underpayments of tax resulting from tax motivated transactions. Freytag v. Commissioner,89 T.C. 849, 886-887 (1987); Gray v. Commissioner,88 T.C. 1306 (1987). [26] *650 To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Thomas H. Mallory and Sandra Mallory, docket No. 23743-84, and Sandra Mallory, a/k/a Kelly S. Mallory, docket No. 23949-84.↩
2. Unless otherwise indicated, section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and rule references are to the Tax Court Rules of Practice and Procedure. 3. By order of the Licking County Probate Court dated Oct. 19, 1981, Sandra Lynn Mallory was allowed to change her name to Kelly Smith Mallory. Except where specifically noted, Sandra Mallory will be referenced as Kelly Mallory throughout our opinion.↩
4. Sec. 6621(d) was redesignated as sec. 6621(c)↩ by the Tax Reform Act of 1986, 100 Stat. 2744. See Pub. L. 99-514, sec. 1511(c)(1)(A)-(C)
5. Petitioner Joint Implant Surgeons, Inc. (docket No. 23653-84) concedes the following adjustments as set forth in its notice of deficiency for its taxable year ended Feb. 28, 1978: (1) Adjustment (a) in the amount of $ 1,382.23; (2) adjustment (b) in the amount of $ 13,368; (3) adjustment (c) in the amount of $ 905.20; (4) adjustment (e) in the amount of $ 385; (5) adjustment (f) in the amount of $ 2,367.40; (6) adjustment (g) in the amount of $ 723.37; (7) adjustment (h) in the amount of $ 794.43; and (8) adjustment (i) in the amount of $ 500. Subject to our final decisions concerning the first two issues in this case -- issues relating to the power of attorney and to sec. 6013(e) -- petitioner Kelly Mallory (docket No. 23949-84) concedes the following adjustments as set forth in her notice of deficiency for her taxable year ended Dec. 31, 1977: (1) Adjustment (a) in the amount of $ 270,000; (2) adjustment (d) in the amount of $ 2,000; (3) adjustment (f) in the amount of $ 3,750; (4) adjustment (g) in the amount of $ 9,329.43; (5) adjustment (h) in the amount of $ 1,955.10; (6) adjustment (j) in the amount of $ 2,090.31; and (7) adjustment (k) as set forth in the notice of deficiency for taxable year 1977 to the extent of $ 4,672.40, consisting of $ 385 for professional fees and dues, $ 2,367.40 for conventions and meetings, and $ 1,920 for payments of a security system. Subject to the above-mentioned decisions, the parties agree that in lieu of the deductions disallowed by adjustment (a) in the amount of $ 270,000 as set forth in the notice of deficiency for 1977, Kelly Mallory is entitled to an ordinary loss deduction in the amount of $ 79,459. The parties also agree that with respect to 1977 Kelly Mallory is not entitled to compute an investment tax credit on the amount of $ 470,000 arising by reason of the acquisition and alleged placing in service of a master recording and as more particularly described on Schedule 4 of the notice of deficiency for such year. Petitioners Thomas and Kelly Mallory (docket No. 23743-84) concede the following adjustments as set forth in their notice of deficiency for their taxable year ended Dec. 31, 1978: (1) Adjustment (a) in the amount of $ 67,500; (2) adjustment (b) in the amount of $ 82,872.26; (3) adjustment (d) in the amount of $ 267.48; (4) adjustment (f) in the amount of $ 13,966.31; (5) adjustment (g) in the amount of $ 2,221.29; and (6) adjustment (i) in the amount of $ 202.87. The parties agree that with respect to 1978, Thomas and Kelly Mallory are not entitled to compute investment tax credit on $ 655,000 arising by reason of the acquisition and alleged placing in service of certain art lithographs as more particularly described on Schedule 4 of the notice of deficiency for such year. 6. We need to address this innocent spouse issue only if we answer the first issue in the negative. ↩
7. Stock Farms represents a predecessor in interest to an Ohio corporation, T. H. Mallory & Sons Standard Breds, Inc. ("Standard Breds"). This former corporation's change of name to Standard Breds was accomplished through the filing of an amendment to the articles of incorporation of Stock Farms on Oct. 10, 1980. Except where specifically noted, Standard Breds will be referenced as Stock Farms throughout our opinion.↩
8. The Mallorys also relied on the advice of Joe Fodey, the office and business manager of Joint Implant until his termination in 1980.
9. This power and all such powers to which reference is subsequently made in this opinion were executed on respondent's Form 2848. These preprinted forms contain language similar to the following, "This power of attorney revokes all earlier powers of attorney and tax information authorizations on file with the Internal Revenue Service for the same matters and years or periods covered by this form." Additionally, the forms executed prior to January of 1982 provide five specific powers that are granted to the powers' attorneys-in-fact by the taxpayers signing each Form 2848. The taxpayer is advised to strike through any of the five powers which are not granted. One of the enumerated powers is the authority "to execute consents extending the statutory period for assessment or collection of taxes." None of the powers in this case which were executed prior to January of 1982 contained "strike-throughs" of any of the enumerated powers; and thus, each of these powers granted its attorney-in-fact an unlimited power of attorney.
10. We note that, as a general rule, a husband and wife are jointly and severally liable for any tax or deficiency owed on a joint income tax return. Sec. 6013(d)(3); Gordon v. United States,757 F.2d 1157, 1160 (11th Cir. 1985); Garfinkel v. Commissioner,67 T.C. 1028, 1030 (1977); Dolan v. Commissioner,67 T.C. 1028, 1030 (1977); Dolan v. Commissioner,44 T.C. 420, 426 (1965). One of the fundamental characteristics of joint and several liability is that the obligee (respondent) may proceed against the obligors (joint taxpayers) separately and may obtain separate judgments against each. Dolan v. Commissioner,44 T.C. at 427. It would appear that respondent has had to direct the notice of deficiency tied to the Mallorys' 1977 joint return to Kelly Mallory because the statute of limitations has run with respect to Thomas Mallory. The September 15th Power does represent a valid power executed by Thomas Mallory on his own behalf.↩
11. Sec. 1.6013-1(a)(2), Income Tax Regs., states, A joint return of a husband and wife (if not made by an agent of one or both spouses) shall be signed by both spouses. The provisions of paragraph (a)(5) of § 1.6012-1 [Income Tax Regs.], relating to returns made by agents, shall apply where one spouse signs a return as agent for the other, * * *. Sec. 1.6012-1(a)(5), Income Tax Regs., provides: Whenever a return is made by an agent it must be accompanied by a power of attorney (or copy thereof) authorizing him to represent his principal in making, executing, or filing the return. A Form 2848, when properly completed, is sufficient. In addition, where one spouse is physically unable by reason of disease or injury to sign a joint return, the other spouse may, with the oral consent of the one who is incapacitated, sign the incapacitated spouse's name in the proper place on the return followed by the words "By     Husband (or Wife)", and by the signature of the signing spouse in his own right, provided that a dated statement signed by the spouse who is signing the return is attached to and made a part of the return stating -- (i) The name of the return being filed, (ii) The taxable year, (iii) The reason for the inability of the spouse who is incapacitated to sign the return, and (iv) That the spouse who is incapacitated consented to the signing of the return.↩
12. See Griffith v. Commissioner,T. C. Memo. 1988-445↩.
13. See Griffith v. Commissioner,T.C. Memo. 1988-445↩.
14. Cf. Griffith v. Commissioner,T.C. Memo. 1988-445↩.
15. Under this three-year period, the sale of the Florida condominium may date back to at least February 10, 1983. Any sale occurring in 1983 would represent a sale within the preadjustment year as that year is defined in sec. 6013(e)(4)(C)↩. The preadjustment year is 1983 because the notice of deficiency with respect to Kelly Mallory's 1977 taxable year was mailed in April of 1984.
16. A spouse may avoid liability for the tax owed on a joint return by showing that the joint return was not actually made ( Calhoun v. Commissioner,23 T.C. 4 (1954)), or that his or her signature on the return was obtained through duress or deception ( Brown v. Commissioner,51 T.C. 116 (1968)), or that he or she qualifies for relief under the innocent spouse provisions (section 6013(e)↩). 17. Sec. 6013(e) was amended by the Tax Reform Act of 1984 with retroactive application to all open taxable years to which the Internal Revenue Codes of 1954 and 1939 apply. See Pub. L. 98-369, sec. 424, 98 Stat. 494, 801-803; H. Rept. 98-432 (Part 2), 1501, 1503 (1984).
18. Shea v. Commissioner,780 F.2d 561, 565-566↩ (6th Cir. 1986), affg. in part and revg. in part a Memorandum Opinion of this Court. 19. Estate of Probinsky v. Commissioner,T.C. Memo. 1988-371↩.
20. In 1977 applicable tax rates on taxable income in excess of $ 3,200 ranged from a low of 14 percent to a high of 70 percent.↩
21. Petitioner Kelly Mallory's analysis in the reply brief is as follows: In determining whether the limitation contained in Section 6013(e)(4) is applicable, one must first determine the amount of the substantial understatement of tax attributable to grossly erroneous items. The understatement of tax attributable to the grossly erroneous master recording deductions and credits is computed as follows: Tax Table Income Per Return
$ 64,524.24  Add: Adjustments Resulting from
Disallowed Master Recording Deductions  190,541.00 Total Tax Table Income
$ 255,065.00 Less Allowable Exemption
(3,750.00)    TAXABLE INCOME
$ 251,315.00 Revised Income Tax
$ 144,660.50 Less General Tax Credit
(180.00)      TOTAL TENTATIVE TAX
$ 144,480.50 Less Investment Credit
(8,687.89)    TOTAL REVISED TAX LIABILITY
$ 135,792.00 Less Tax Liability as Reported on Return
-0-    TOTAL TAX LIABILITY FROM GROSSLY
ERRONEOUS ITEMS  $ 135,792.00 COMPUTATION OF SECTION 6013(e)(4) MAXIMUM
ADJUSTED GROSS INCOME AMOUNT
$ 135,792 / 25% = $ 543,168.00
Therefore, in order for the Section 6013(e)(4) limitation to apply, the Court must find that Petitioner Kelly S. Mallory's adjusted gross income for taxable year 1983 exceeded $ 543,168.00. Petitioner Kelly S. Mallory testified that her only source of income is a salary she earns as an employee of Joint Implant Surgeons, Inc. She further testified that she has not received a salary increase in a very long time. In 1982 Petitioner Kelly S. Mallory reported gross income of $ 31,725.00. * * * The evidence clearly supports a finding that Petitioner Kelly S. Mallory's adjusted gross income for 1983 is equal to or less than $ 31,750.00 and obviously less than $ 543,168.00. Therefore, the Section 6013(e)(4) limitation does not apply. Respondent attempts to ascribe additional income to Petitioner Kelly S. Mallory for taxable year 1983 based on her statement that she owned and sold a condominium in Floridawithin three (3) years prior to the trial of this case. Respondent's attempt can best be described as far reaching. First, Respondent did not present any evidence that the sale occurred in 1983. Second, even if the sale did occur in 1983, the possibility that Petitioner Kelly S. Mallory would realize more than $ 543,000.00 of adjusted gross income is so remote as to border on the impossible. The discussion below highlights the absurdity of the contrary finding. The condominium referred to by Petitioner Kelly S. Mallory was purchased in 1977 for approximately $ 67,000.00. After furnishings and improvements, the basis in the condominium approximated $ 100,000.00. The condominium is a capital asset and the gain, if any, from the sale is subject to the 60 percent capital gains deduction in arriving at adjusted gross income. Therefore, the selling price of the condominium must approximate $ 1,278,000.00 to realize adjusted gross income of $ 543,000.00 (the sale price takes into consideration Petitioner's salary of $ 31,725,00). In other words, during the period 1977 to 1983, a period of seven (7) years, the condominium would have had to appreciate in excess of 175 percent per year. Taking the above facts into consideration, there can be no other finding except that the limitation contained in Section 6013(e)(4)↩ is not applicable to Petitioner Kelly S. Mallory for the tax liability resulting from the disallowed master recording deductions and credits for taxable year 1977.
22. The asphalt was used in the construction of a driveway which passed the Mallorys' barn and continued toward their personal residence.↩
23. Thomas testified that he used for work-related travel a number of cars owned by the Mallorys. Once again, however, no corroborating evidence existed in the record which supported this petitioners' self-serving testimony.↩
24. Karlin v. Commissioner,T.C. Memo. 1987-532↩.
25. This is especially true when we observe that the courtroom demeanor of both Thomas and Kelly Mallory convinces us that both are very intelligent individuals. ↩
26. Adjustments appearing in the notices of deficiency in this case and not specifically mentioned or addressed anywhere in this opinion represent adjustments which petitioners have apparently conceded. Petitioners bear the burden of proof, Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a), and have presented no evidence going to these adjustments. The adjustments are sustained. Additionally, in their petition, petitioners requested that they be awarded litigation costs. Petitioners are obviously not "prevailing parties" as that phrase is defined in sec. 7430(c)(2). Moreover, petitioners' request was improperly pled. Rule 231 is clear in its statement that where there "is no agreement as to that [prevailing] party's entitlement to such [litigation] costs, a claim shall be made by motion↩ * * *." (Emphasis added.) Consequently, petitioners' request is moot.