SAMUEL POLLACK AND ANNIE POLLACK, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4534–62, 385–63, 765–64. Filed October 28, 1966.

---

[1] Proceedings of the following petitioners are consolidated herewith: Irving and Marcella Pollack, docket No. 385–63; and Irving E. Miller and Shirley Miller, docket No. 765–64.

*Hugh F. Culverhouse* and *Arthur J. England, Jr.*, for the petitioners.

*James D. Burroughs* and *Louis J. DeReuil*, for the respondent.

94

96

98

102

OPINION

RAUM, *Judge:* 1. *Qualification of Shelborne Enterprises, Inc., as "Small Business Corporation".*—In 1957, Irving Pollack and others joined together to purchase the Shelborne Hotel in Miami Beach, Fla. The price was payable in large part out of the proceeds of mortgage notes, but additional cash in the amount of $500,000 was required. Such cash was put up as follows: $125,000 by Pollack; $125,000 by a group headed by Charles Yavers, who was to be active with Pollack in managing the hotel; and $125,000 each by Irving E. Miller and Morris Popkin, neither of whom was to take part in operating the property. It was understood that Pollack and the Yavers group would each obtain a one-third interest in the venture but that Miller and Popkin would each acquire only a one-sixth interest therein. Title to the hotel was taken in the name of a corporation, Shelborne Enterprises, Inc., that was organized for that purpose. For reasons appearing in our findings the operation of the hotel resulted in substantial losses.

In 1958, Shelborne Enterprises, Inc., as a "small business corporation," elected under section 1372 of the 1954 Code not to be subject to income tax. In general, the shareholders of such electing small business corporation must account for any undistributed net income

(sec. 1373), but they are also allowed deductions in respect of net operating losses (sec. 1374). The Commissioner supports his disallowance of such losses claimed herein for the years 1958 and 1959 on the ground that Shelborne Enterprises, Inc., was not entitled to make the election since it did not qualify as a "small business corporation" by reason of its failure to satisfy the requirement of section 1371(a)(4)[6] that it may not have more than one class of stock. The narrow question before us is therefore whether the corporation did have more than one class of stock. On this record the answer appears clear to us that it did and that it therefore failed to qualify as a small business corporation.

At about the time the corporation was organized, and prior to the issuance of any stock, an amendment to the articles of incorporation was adopted to the effect that there were to be four classes of common stock consisting of the following number of shares:

|  | Number of shares |
|---|---|
| Class A | 33⅓ |
| Class B | 33⅓ |
| Class C | 16⅔ |
| Class D | 16⅔ |

The amendment set forth that each class was to have the right to elect one director so that the right to elect directors was not proportionate to the number of shares in each class. The reason for this rather unusual classification would seem to be plain enough. Miller and Popkin each supplied one-fourth of the cash for the venture but obtained only a one-sixth interest therein. It seems entirely reasonable in the circumstances that they would be given an equal voice in the selection of directors.

Petitioners make various arguments (some of them confusingly overlapping) in answer to the Commissioner's position, but we think they can be conveniently considered under two principal contentions: (a) That no such different classes of stock were in fact effectively issued and outstanding at the time of the election; and (b) that even if they were effectively issued they did not constitute "more than one class of stock" under the Code as properly construed in the light of administrative rulings. We think that neither of these contentions is sound.

---

[6] SEC. 1371. DEFINITIONS.

(a) SMALL BUSINESS CORPORATION.—For purposes of this subchapter, the term "small business corporation" means a domestic corporation which is not a member of an affiliated group (as defined in section 1504) and which does not—

(1) have more than 10 shareholders;
(2) have as a shareholder a person (other than an estate) who is not an individual;
(3) have a nonresident alien as a shareholder; and
(4) have more than one class of stock.

(a) The Florida statutes provide, Fla. Stat. Ann. sec. 608.14(1),[7] that a corporation may issue the shares of stock authorized by its charter "and none other," and that its common or preferred stock may be divided into classes with such distinguishing characteristics relating to, among other things, "voting powers or restrictions or qualifications of voting powers as shall be stated in the certificate of incorporation." The same section of the statute further states that "Restrictions and qualifications of voting powers so imposed shall control in all cases where any vote * * * is * * * required by statute unless such statute shall expressly provide to the contrary."

Accordingly, since the Shelborne charter directed that the 100 authorized shares be divided into four specified classes with unequal voting power in respect of election of directors, it would seem that the only way in which the corporation could have issued its shares would have been to issue them in the four classes authorized by the charter, namely, A, B, C, and D. The fact that the certificates actually given to the shareholders were not explicitly identified as falling within those classes could hardly avoid the plain statutory directive that a corporation may issue the shares authorized by its charter "and none other." And although the certificates did not bear any legend identifying the class involved, the record herein is clear that the shares issued to Pollack were class A, those to the Yavers group class B, those to Miller class C, and those to Popkin class D. Indeed, petitioner's counsel conceded at the hearing that "It is true that under the laws of Florida a stock certificate doesn't have to bear the legend that it is a separate class * * *."[8] Petitioner's counsel does not renew this concession on brief but appears to argue that other provisions of the Florida Statutes, sec. 608.41(1)(b),[9] require each stock certificate to

---

[7] 608.14   Capital stock; power to issue, etc.

(1) Every corporation *may issue the shares of stock authorized by its certificate* of incorporation *and none other.* Such shares may consist of common stock of a par value stated in the certificate of incorporation, common stock of no par value, and preferred stock. Each may consist of two or more kinds, which may be divided into classes and classes into series, and each kind, *class* and series may have such distinguishing characteristics, including designations, preferences or restrictions as regards dividends, redemption, *voting powers* or restrictions or qualifications of voting powers as shall be stated in the certificate of incorporation. Restrictions and qualifications of voting powers so imposed shall control in all cases where any vote or consent of stockholders is now or hereafter required by statute unless such statute shall expressly provide to the contrary. [Italic supplied.]

[8] He went on to state, however, that he would offer oral testimony to establish that the parties *never intended or agreed "to treat any stock as separate classes."* We consider this argument hereinafter.

[9] 608.41   Stock certificates; bonds and debentures

(1)(a) Every stockholder shall be entitled to have for each kind, class or series of stock held, a certificate certifying the number of shares thereof held of record by him. Certificates shall be signed by the president or a vice-president and the treasurer or an assistant treasurer, or the secretary or an assistant secretary, and sealed with the seal of the corporation. The seal may be facsimile, engraved, or printed. Where such certificate is signed by (a) a transfer agent or an assistant transfer agent, other than the cor-

summarize or to incorporate by reference or to set forth in full any class designation and pertinent distinguishing characteristics. Whether such is required by those provisions may well be open to question. They certainly do not explicitly impose such requirement, and whether they do so by implication is at least arguable. But we need not resolve this possible issue, for, even if there were such requirement, failure to comply with it would not vitiate the plain mandate of section 608.14(1) which permits a corporation to issue *only* those shares authorized by its charter. At most, such failure might give rise to rights against the corporation or others in favor of a particular stockholder who was damaged in some way by that failure. But plainly it would not transmute the various classes of stock into classless stock in clear violation of section 608.14(1) under which the corporation had power to issue stock in the classes designated by its articles "and none other."

Petitioners argue also that the interested parties were unaware of the existence of the four separate classes of stock and that the attorney, Milton Weiss, had no authority to provide therefor in the articles of incorporation. However, whether the subscribers may or may not have been aware that there were four classes of stock because they failed to read or otherwise inform themselves of the contents of the articles is a matter that affords them no relief under State law. Cf. *Bryan* v. *St. Andrews Bay Community Hotel Corp.*, 99 Fla. 132, 141, 126 So. 142, 145. Moreover, we are not satisfied on this record that the stockholders were in fact unaware of the existence of the four classes of stock or that Milton Weiss was in fact without authority to make provision therefor.

While it is true that there was testimony tending to disclaim knowledge by the stockholders with respect to the four classes of stock, we found it far from convincing. On at least two occasions the principals executed instruments in which their stockholdings were clearly and prominently identified by class. Pollack signed only one of them, but read the other with sufficient care to refuse to sign it on grounds

poration itself, or by (b) a transfer clerk acting on behalf of the corporation and a registrar, the signature of any of those officers named herein may be facsimile. In case any officer who signed, or whose facsimile signature has been used on any certificate shall cease to be such officer for any reason before the certificate has been delivered by the corporation, such certificate may nevertheless be adopted by the corporation and issued and delivered as though the person who signed it or whose facsimile signature has been used thereon had not ceased to be such officer.

(b) It shall not be necessary to set forth in said certificate the provisions of the certificate of incorporation in original or amended form showing the class or classes of stock authorized to be issued by the corporation and the distinguishing characteristics thereof. If the corporaton so elects, said provisions may be either (a) summarized on the face or back of the certificate or (b) incorporated by reference made on the face or back of the certificate where such reference states that a copy of said provisions, certified by an officer of the corporation, will be furnished by the corporation or its transfer agent, without cost, to and upon request of the certificate holder.

unrelated to the matter of classification. We are satisfied that the parties to these instruments, who were shrewd and perceptive business-men, read them with care, and that they were fully on notice with respect to the classification of their stockholdings. In addition, there was testimony by Popkin that he understood that the could have elected himself a director—a matter plainly referable to the voting power associated with his class of stock.

Similarly, there is no credible evidence that Weiss acted without authority. True, the amendment to the charter was probably precipi-tated by Pollack's request to increase the corporate capital from $10,000 to $100,000. But the record contains no convincing evidence that he acted without authorization in setting up the four classes of stock. Weiss was retained to organize the corporation and to put it into busi-ness. In drafting the original articles as well as the virtually con-temporaneous amendment, he, like other lawyers similarly engaged, undoubtedly had at least implied authority to use his professional judgment as to the numerous matters to be included in such documents for the purpose of achieving the basic objective for which he was retained. At the very least, the parties were on notice that articles of incorporation and an amendment thereto had been drafted, and they surely were in a position to reject any provisions that they found unsatisfactory. They did not do so. The charge that he acted with-out authority is further belied by their subsequent acquiescence in the description of their stockholdings in the two agreements discussed above. They certainly could have had the articles amended again at that time so as to eliminate the four classes of stock if they had disap-proved thereof, but they took no such action.

Furthermore, in view of the stress laid upon Weiss' alleged lack of authority, petitioners' case is further weakened by their failure to present him as a witness. Their explanation for his alleged unavail-ability as a witness at the time of trial was not satisfying,[10] and no effort appears to have been made to obtain his deposition or to seek the scheduling of the trial at a time when he might be available. The burden of proof was upon petitioners and we cannot assume that the testimony of a critical absentee witness would have been favorable to them. Indeed, the normal inference is that it would have been un-favorable. Cf. *Stoumen* v. *Commissioner*, 208 F. 2d 903, 907 (C.A. 3) ; *Wichita Terminal Elevator Co.*, 6 T.C. 1158, 1165, affirmed 162 F. 2d 513 (C.A. 10) ; *Interstate Circuit* v. *United States*, 306 U.S. 208, 226.

Nor is there any basis for attack upon the establishment of the four classes of stock by referring to the use of dummies in the incorporation

[10] The Court's response of "All right" at the trial after counsel's attempted explanation for the absence of Weiss was not intended to indicate that it was satisfied with the explana-tion. It merely indicated that, having called the situation to counsel's attention, it was not pursuing the matter further.

process and their election of Pollack, Charles Yavers, Miller, and Popkin as directors. As already noted, Weiss was retained to organize the corporation and to put it into business. The use of dummies (acting under the direction of the attorney) for this purpose is common, and petitioners cannot be heard at this late date to disavow the acts of such nominal parties. They cannot now pick and choose, selecting only those aspects of the incorporation that are advantageous to them, while at the same time rejecting others that turn out to be unfavorable.

(b) Petitioners argue alternatively that even if the corporation had the four classes of stock spelled out in its charter, the difference between those classes was not such as to result in more than one class of stock within section 1371(a)(4) of the Internal Revenue Code of 1954 (fn. 6, *supra* at 105). We hold otherwise.

Granted that the difference between the classes was not great—merely a difference in voting power to elect directors—it was nevertheless a difference that could have practical consequences, and it is difficult to see how we can ignore the plain words of the statute. The shareholders in the various classes had unequal voting power in respect of election of directors; the classes were separately identified as such in the charter, as amended; and it seems clear that the statute covers this situation.

The Government's position is confirmed by the Treasury regulations [11] which construe section 1371(a)(4). The regulations make it clear that "a difference as to voting rights * * * will disqualify a corporation." However, it was recognized that there might be situations where stock would be artificially designated as comprising several classes for the purpose of selection of directors but where the voting power as among the shares of stock of the various classes was not unequal. There would thus in fact be no difference whatever in the quality of the voting power associated with the various nominal classes of stock, and the regulations therefore provided further that:

if two or more groups of shares are identical in every respect except that each group has the right to elect members of the board of directors in a number proportionate to the number of shares in each group, they are considered one class of stock. * * *

---

[11] Income Tax Regs., sec. 1.1371–1(g):

(g) *Classes of stock.* A corporation having more than one class of stock does not qualify as a small business corporation. * * * If the outstanding shares of stock of the corporation are not identical with respect to the rights and interest which they convey in the control, profits, and assets of the corporation, then the corporation is considered to have more than one class of stock. Thus, *a difference as to voting rights*, dividend rights, or liquidation preferences of outstanding stock will disqualify a corporation. However, if two or more groups of shares are identical in every respect except that each group has the right to elect members of the board of directors in a number proportionate to the number of shares in each group, they are considered one class of stock. If an instrument purporting to be a debt obligation is actually stock, it will constitute a second class of stock. [Italic supplied.]

Thus, if the charter created two nominal classes of stock of 50 shares each, and provided that the stockholders of each class were empowered to elect an equal number of directors, the voting power of each share would be identical with the voting power of any other. Accordingly, the regulations quite appropriately treated that situation as involving in fact only one class of stock. The present case is different, because the voting power of the various shares of stock was unequal, depending upon their classification.

Petitioners appear to recognize that, in view of the absence of the required proportionality, their case does not fall within the limited exception articulated in the regulations. But they nevertheless argue that these regulations must somehow or other be ignored because they were promulgated December 18, 1959, only shortly before the end of the second of the two tax years here involved and because they are allegedly in conflict with a "release" issued about a year earlier by the Internal Revenue Service. We think these grounds are without substance. The statute itself, apart from the regulations, disqualifies Shelborne as a "small business corporation." Moreover, not only are the regulations applicable to the tax years in question, but their force cannot be diminished by the release, which was in any event arguably ambiguous in this respect.

Subchapter S, relating to small business corporations was added to the 1954 Code on September 2, 1958, by section 64 of the Technical Amendments Act of 1958, 72 Stat. 1606, and the regulations here involved were promulgated a year and several months thereafter. Section 7805 of the 1954 Code [12] authorizes the Commissioner to prescribe all necessary rules and regulations for the enforcement of the revenue laws and further provides that he may prescribe the extent to which any ruling or regulation shall be applied without retroactive effect. It is clear therefore, that unless the Commissioner otherwise specifies, regulations are retroactive to the date on which the statute was enacted. *Dixon* v. *United States*, 381 U.S. 68, 72–75; *Automobile Club of Michigan* v. *Commissioner*, 353 U.S. 180, 183–184; *Helvering* v. *Reynolds*, 313 U.S. 428; *Manhattan General Equipment Co.* v. *Commissioner*, 297 U.S. 129, 134–135. The Commissioner has at no time specified that the regulation here involved was not to be given retro-

---

[12] SEC. 7805. RULES AND REGULATIONS.

(a) AUTHORIZATION.—Except where such authority is expressly given by this title to any person other than an officer or employee of the Treasury Department, the Secretary or his delegate shall prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue.

(b) RETROACTIVITY OF REGULATIONS OR RULINGS.—The Secretary or his delegate may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.

active effect. We reject petitioners' contention which is based upon the date of promulgation of the regulation.

Nor is a different result called for by reason of a Technical Information Release published November 26, 1958, T.I.R. No. 113, upon which petitioners rely. That release certainly could not bind the Commissioner, cf. *Dixon* v. *United States*, 381 U.S. 68, and in any event it was at best ambiguous in respect of the problem before us. In question and answer form it undertook to deal with a number of questions relating to small business corporations. Among other things, it stated that a corporation would be considered to have only one class of stock where it has "class A common and class B common with equal dividend rights, equal liquidation preferences, and equal voting rights except that each class has the right to elect half the members of the board of directors." This release does not explicitly contain the further requirement of proportionality, but it is at least arguable that such should be implied since the release was obviously undertaking to describe shares of stock having identical rights. It was certainly within the Treasury's rule-making power to clarify the matter by regulation, as it did. Petitioners have no vested rights in their interpretation of the release. *Dixon* v. *United States, supra.*[13]

2. *Pollack's 1959 Loss on Sale of Shelborne Stock.*—On January 2, 1959, Irving Pollack sold his remaining 20 shares of Shelborne stock to Morris Popkin for $10,000. In computing the loss on that sale he claimed a basis of $33,000 with a resulting loss of $23,000. Both parties appear to agree that Pollack's cost basis of these shares was $20,000. Accordingly, since we have decided that Shelborne was not a small business corporation, adjustments to that basis are not required by reason of the corporate losses. Pollack is therefore entitled to a capital loss deduction in the amount of $10,000 on the sale.

3. *Installment Method of Reporting Gain on Sale of Real Estate.*— The final issue involves only the petitioners Miller and relates to the year 1959. In 1959, Irving E. Miller sold an interest in unimproved land at a sales price of $564,173.41, of which he received $146,995.29 in cash at the closing. The remainder of the sales price was represented by purchase money mortgage notes in the amount of $213,353.12, and the purchaser's assumption of outstanding mortgage obligations in the amount of $203,825. The property had a reported basis of $283,500, and thus the gain realized on that sale was $280,673.41. Miller was fully aware that he could report that gain in full for

---

[13] Since we have concluded that the corporation had more than one class of stock by reason of the provisions for class A, B, C, and D common, we do not reach the further question presented by the Government that Shelborne was in any event disqualified because the debentures and obligations on the cash advances to the corporation constituted another class of stock, nor do we consider the applicability of *W. C. Gamman*, 46 T.C. 1, which appears in any event to present a different factual situation.

1959, or that he might elect to report it by the installment method whereby he would be accountable in 1959 only for the proportionate amount of the profit reflected in the payment actually received in 1959.[14] He chose to report the entire gain for 1959.

The 1959 return filed by Miller and his wife was an involved one. It contained many items of income and deductions. The aggregate amounts were large, but the net effect of all the items was a comparatively insignificant amount of taxable income. One of the factors which produced this result was Miller's $43,869.39 claimed share of the 1959 loss sustained by Shelborne Enterprises, Inc. And the expectation of taking this loss as a deduction was one of the elements considered in deciding to report the full $280,673.41 gain on sale of the unimproved land in 1959.[15]

After it appeared that the Shelborne loss might not be deductible by reason of the corporation's failure to qualify as a small business corporation, the Millers attempted to reverse their election to report the gain on sale of the unimproved land in full in 1959 and they now seek to have that gain taxed on the installment method. We hold that petitioners are bound by the election made on their original 1959 return.

Although petitioners would have been entitled to utilize the installment method of reporting, they elected otherwise, and their attempt to take advantage of that method now comes too late. They may not undo what they have done. *Pacific National Co.* v. *Welch*, 304 U.S. 191; *United States* v. *Kaplan*, 304 U.S. 195.

This case is unlike the situations and decisions dealt with in Rev. Rul. 65-297, 1965-2 C.B. 152 (see also T.I.R. 756, Aug. 24, 1965),

---

[14] SEC. 453. INSTALLMENT METHOD.

(a) DEALERS IN PERSONAL PROPERTY.—Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—

(1) GENERAL RULE.—Income from—

(A) a sale or other disposition of real property, * * *

.*     *     *     *     *     *     *

may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).

(2) LIMITATION.—Paragraph (1) shall apply—

(A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition—

(i) there are no payments, or

(ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

[15] We reject any testimony or inference that this was the sole item taken into account 'n deciding not to use the installment method. Obviously, Miller and his accountant were considering the net effect of all the items on the return, and the Shelborne loss was but one of a number of large deductions that would be utilized to offset all the income to be reported.

where there was a failure to make *any* election in the original return;[16] nor is it like the situation where the election that the taxpayer attempted to make was not open to him. Cf. *Mamula* v. *Commissioner*, 346 F. 2d 1016 (C.A. 9), reversing 41 T.C. 572. Here, petitioners did make an available election on their original return. They could have selected either the installment method or the method that they actually used. Having thus made that election they may not now reverse such action. The very situation before us was distinguished in *Hornberger* v. *Commissioner*, 289 F. 2d 602 (C.A. 5), where the court reached a different result on the facts before it (p. 604):

We are not dealing with a case where a taxpayer has made an election by reporting the sale on a deferred payment basis and subsequently seeks to change his position, as was the situation in Pacific National Company v. Welch, 304 U.S. 191, 58 S. Ct. 857, 82 L. Ed. 1282, and in Jacobs v. Commissioner, 9 Cir., 224 F. 2d 412, * * *

Since we have concluded that petitioners were bound by the election made on their 1959 return, we do not reach the Commissioner's further contention that the installment method is in any event not available to petitioners since they have failed to show that there were no payments by the purchaser in 1959 on the assumed mortgage obligation which together with the cash received at the closing might exceed the permissible 30-percent limit. Cf. *Ivan Irwin, Jr.*, 45 T.C. 544, on appeal (C.A. 5).

*Decisions will be entered under Rule 50.*

---

[16] Cf., *e.g.*, *Jack Farber*, 36 T.C. 1142, affirmed 312 F. 2d 729 (C.A. 2), certiorari denied 374 U.S. 828; *John F. Bayley*, 35 T.C. 288; *Nathan C. Spivey*, 40 T.C. 1051; *John P. Reaver*, 42 T.C. 72.