JAMES ARETAKIS AND DEBORAH M. ARETAKIS, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Aretakis
Docket No. 27409-90
United States Tax Court
T.C. Memo 1992-356; 1992 Tax Ct. Memo LEXIS 379; 63 T.C.M. (CCH) 3171; June 23, 1992, Filed *379 Decision will be entered under Rule 155. Brad Pollack, for petitioners. William R. Davis, Jr., for respondent. PATE
PATE
MEMORANDUM FINDINGS OF FACT AND OPINION PATE, Special Trial Judge: This case was assigned pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182. [1]
Respondent determined deficiencies in petitioners' 1985, 1986, and 1987 Federal income taxes of $ 860, $ 1,547, and $ 1,979, respectively. After concessions by both parties, the issue for our decision is whether Deborah Aretakis engaged in horse breeding and training activities (hereinafter referred to collectively as horse breeding activities) with a profit objective. FINDINGS OF FACT Some of the facts have been stipulated and they are so found. The Stipulation of Settled Issues, Stipulation of Facts, and attached exhibits, are incorporated herein by this *380 reference. James Aretakis and Deborah M. Aretakis (hereinafter collectively referred to as petitioners) timely filed joint Federal income tax returns for 1985, 1986, and 1987. At the time they filed the petition herein, they resided in Morrison, Colorado. Deborah M. Aretakis (hereinafter petitioner) had her first experience with horses at the age of 5 when she began riding. She owned a horse at the age of 15 and began showing horses when she was in high school. In 1970, she "broke" a 2-year-old thoroughbred. Since 1970, she has owned at least one horse at all times. Petitioner entered into the horse breeding activity in issue in 1975, when she purchased a mare named Spicy Question (hereinafter Spicy). She brought Spicy to Stagecoach Ranch, Golden, Colorado, to be bred. Thereafter, Spicy had a filly, which later died of spinal meningitis. While Spicy was at Stagecoach Ranch, petitioner talked with the operator, Ms. Ann Baxtrom, regarding the proper feeding of horses and observed how her breeding barns and sheds were set up. On Ms. Baxtrom's advice, petitioner joined the American Quarter Horse Association to establish contacts with experts in the horse breeding business. *381 Petitioner also subscribed to various periodicals such as the Quarter Horse Journal, the Rocky Mountain Quarter Horse Association Racing Journal, the American Quarter Horse Association Racing Journal, and the Quarter Horse Track Magazine. All of these periodicals publish breeding information, including information regarding bloodlines and stud fees. At the time, petitioner was boarding Spicy and her other horses at Aurora Stables in Aurora, Colorado. Consequently, she also had the opportunity to observe how the Aurora Stables were set up and was able to consult with its owner/operator, Carl Baker, with regard to running a horse breeding farm. However, they never discussed how to profit from such an operation. In 1978, petitioners began looking for property suitable for a horse breeding farm. They eventually purchased a home on approximately 2 acres on which they built a barn, stable, and corral. The property was zoned to allow a maximum of four horses to be pastured thereon. Petitioners moved their horses from Aurora Stables to their farm in 1984. Petitioner then bred Spicy to a sire owned, trained, and maintained by Carl Baker. On March 10, 1985, Spicy gave birth to a foal, *382 "Casey". Petitioner attempted to breed Spicy again in 1989 and again in 1990, but both attempts were unsuccessful. Subsequently, Spicy developed terminal cancer. In 1985, petitioner quit her outside employment and, thereafter, spent great care in feeding, bathing, and walking Casey. She worked with him for 2 to 3 hours every day, teaching him to lead, stand, and pick up his feet. She recorded his every new activity, showing the progress of his training. She also "mucked out" the corrals, stacked and hauled hay, and cleaned the stables. Although Mr. Aretakis worked full-time as a wallpaper contractor, he aided petitioner in operating the horse breeding farm by maintaining and fixing the farm equipment. In an effort to provide cash flow for the farm, in 1987, he bought and repaired some farm equipment and sold it at a profit. Petitioner maintained records of her horse breeding activities. Although she maintained only one checking account in which she deposited and disbursed funds attributable to her husband's wallpaper business, her horse breeding activity, and their personal needs, she was able to account for each activity by segregating the checks and invoices into separate *383 files. Petitioner consulted with an accountant and relied on recommendations published in the 1984 American Farmer's Tax Guide to establish her recordkeeping system. In 1985, petitioner asked Carl Baker to evaluate Casey's potential as a race horse. Carl Baker had trained horses for over 50 years, and had won ribbons and trophies showing hunter/jumpers. In 1982, he won first and second place at the Grand Prix level puissance (the highest competitive jumping level) of the National Western Stock Show. However, he was not a professional race horse trainer. Upon his advice, petitioner had Casey neutered in June 1986. Subsequently, petitioner obtained references for trainers from the American Quarter Horse Association. Following up on such referrals, she contacted John Hamner, a trainer in Holly, Colorado, who recommended that Terry Ellis, of Ellis Ranch, Loveland, Colorado, begin Casey's training. In 1987, after viewing a videotape of Casey, Mr. Ellis determined that Casey could "run". Thereafter, petitioner contracted with Mr. Ellis for Casey's training, but, to conserve funds, trained Casey herself for the first 60 days. In 1987, petitioner and Mr. Ellis decided that she *384 should enter Casey in the Tom Foster Futurity and the Farmers' Futurity races, and petitioner paid the advance entry fees in April of that year. In May, petitioner brought Casey to the Ellis Ranch for his formal race training. However, after only 1 month of training Casey sustained an injury to his leg and, thereafter, was unable to race. Petitioner then consulted with Carl Baker and the assistant trainer at Ellis Ranch, both of whom had trained hunter/jumpers. Upon receiving favorable reports as to Casey's potential, she transferred him to Aurora Stables for hunter/jumper training. During this period, also to conserve funds, she boarded Casey at her farm, except from December through February, when she boarded him at Aurora Stables to protect him from the harsh winter weather. During 1989 and 1990 Casey won approximately 20 ribbons in hunter/jumper shows, ranging from first to sixth place. However, he never has won any money. At trial, petitioner estimated that Casey was worth $ 20,000, but admitted that she has never solicited nor received an offer to buy Casey. Moreover, she admitted that few trainers are willing to pay such a high price for a hunter/jumper after only 1 *385 year of training. In preparation for trial, petitioner recorded a 5-year plan which she previously had formulated and which she had hoped would result in a profitable horse operation. She planned to: (1) Locate property suitable for building a horse farm; (2) construct thereon a suitable barn, stable, and corral; (3) find the best stallion to breed Spicy; (4) train the foal as a race horse; (5) after 2 years, race him in the Colorado State Fair Circuit, where purses ranged from $ 3,000 to $ 8,000; (6) afterward, race him in New Mexico for purses up to $ 25,000; (7) breed her colt; and then (8) sell her colt and repeat the process. She projected that she would win $ 30,000 during the first 3 years of competition. However, her cash flow chart projected that she would realize a net loss for the first 3 years of operation, and also projected an overall net loss for 5 years. [2] Moreover, she admitted that she did not expect to profit from just one foal. *386 Petitioners deducted horse farm expenses of $ 6,024, $ 7,284, and $ 12,460, on their income tax return for 1985, 1986, and 1987, respectively. During these years, the only income offsetting such expenses was the $ 2,500 which petitioners realized in 1987 from the sale of the equipment purchased and repaired by Mr. Aretakis. This income resulted in petitioners' deducting a net loss of $ 9,960 for 1987. Respondent disallowed all of petitioners' claimed losses, maintaining that they were not engaged in their horse breeding activity for profit. OPINION As a general rule, to deduct losses from an activity, a taxpayer must show that he or she entered into the activity, or continued the activity, with an objective of making a profit. Sec. 1.183-2(a), Income Tax Regs. If a taxpayer engages in the activity without such profit objective, deductions attributable thereto are allowed, but (as applicable here) only to the extent of the income derived from the activity. Sec. 183(b)(1) and (2). The test under section 183 is whether the taxpayer engaged in the activity with an actual and honest objective of making a profit. Beck v. Commissioner, 85 T.C. 557, 569 (1985); *387 Flowers v. Commissioner, 80 T.C. 914, 931 (1983); Dreicer v. Commissioner, 78 T.C. 642, 644-646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Whether a taxpayer had an actual and honest profit objective is a question of fact to be resolved from all relevant facts and circumstances. Hulter v. Commissioner, 91 T.C. 371, 393-394 (1988); Golanty v. Commissioner, supra at 426. The burden of proving such objective is on petitioner. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Greater weight is given to objective facts than to a taxpayer's statement of intent. Beck v. Commissioner, supra at 570; Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); sec. 1.183-2(a), Income Tax Regs.
Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of factors which normally should be considered in *388 determining whether an activity is engaged in with the requisite profit objective. The nine factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor, nor the existence of even a majority of the factors, is controlling. Rather, it is an evaluation of all the facts and circumstances in the case taken as a whole which is determinative. Abramson v. Commissioner, 86 T.C. 360, 371 (1986); Benz v. Commissioner, 63 T.C. 375, 382 (1974); sec. 1.183-2(b), Income Tax Regs.
After evaluating the facts in this case, we are not convinced that petitioner engaged in her horse breeding *389 activities with an actual and honest objective of making a profit. Petitioner presented extensive evidence regarding the operation of her horse farm, the methods and techniques she used to establish and maintain it, and the "experts" who advised her with regard to its operations. Petitioner has shown us that her goal was to race and later to show Casey as a hunter/jumper. What she has failed to do, however, is to show us how she intended to profit monetarily from this activity. In fact, petitioner ran her horse farm without any definite idea as to how she was going to generate a profit therefrom. It clearly was not from horse breeding, as Spicy had only one foal that reached maturity during the almost 15 years that petitioner held her. Further, petitioner made no attempt to acquire other mares for this purpose. Nor are we convinced that petitioner intended to profit by racing Casey. Although racing a horse does, in exceptional cases, make a great deal of money for the owner, it is an extremely speculative venture. This venture becomes even more speculative when the owner trains only one horse. Moreover, petitioner submitted no evidence to show that Casey had any realistic *390 potential to win races; no evidence was submitted to show that Casey's sire or dam had any success in racing or made any money from racing, nor was any evidence presented (other than petitioner's generalized testimony) that Casey himself might become a fast runner. Although petitioner maintains that she took great care in choosing the best sire for Spicy by reading about the various bloodlines of the sires available for breeding, and by reading about their racing records and winnings, after completing all this research, she actually bred Spicy to a sire owned and maintained by Carl Baker, her neighbor at Aurora Stables. Further, petitioner maintains that she relied on qualified experts to advise her on horse breeding activities. She believed Carl Baker to be such an expert because he had trained horses for over 50 years and has won many ribbons and trophies for jumping horses. Unfortunately, petitioner did not call Carl Baker to testify, so this record lacks the specific information he would have been able to provide, which may or may not have corroborated petitioner's testimony. See Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968); *391 Joint Implant Surgeons, Inc. v. Commissioner, T.C. Memo. 1988-558. Further, although petitioner consulted Carl Baker as to Casey's potential as a race horse, there is no evidence that Carl Baker trained race horses; rather, his experience was with hunter/jumpers. Finally, we find that petitioner's projection that Casey would win approximately $ 10,000 a year from racing to be totally unsubstantiated. Petitioner's projected revenues seemed to be more in the nature of "wishful thinking" than objective planning. Nor can we discern any profit objective in petitioner's training Casey as a hunter/jumper. Although Casey won some ribbons in this category, he produced no revenue from such shows. We do not know why this is true; we can only speculate that either Casey was shown competitively in shows offering no monetary awards or he failed to win any such awards. Again, his potential as a hunter/jumper was not adequately demonstrated. Finally, we cannot discern any profit objective in raising and training Casey for resale. Although petitioner testified that he is worth $ 20,000, she failed to substantiate that opinion with any objective evidence. Moreover, because *392 Casey had been neutered, his value had been limited as he could not sire potential winners in either racing or in the hunter/jumper category. Finally, we give particular weight to the fact that petitioner had never offered Casey for sale, nor had she received any bids for him. In summary, petitioner demonstrated that she had a number of years' experience with horses. She supplemented that knowledge through memberships in and subscriptions to various horse associations and publications. She spent a great deal of time and effort with respect to her horse breeding activities. However, despite her expertise and effort, she sustained losses of almost $ 30,000 during the 3 years we have here at issue. During this time, she raised only one horse, and that horse did not produce any revenue, nor did he produce any substantial revenue in succeeding years. While losses incurred during the formative years of an activity are not necessarily fatal to a section 183 determination in the taxpayer's favor, the ultimate goal of an activity engaged in for profit must be to realize a net profit on the activity so as to recoup losses previously sustained. Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), *393 affd. 379 F.2d 252 (2d Cir. 1967). These facts fail to show that petitioner sought such profit in running her horse farm. Accordingly, we hold that petitioner may not deduct the losses she sustained in her horse breeding activity. Due to concessions by both parties, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. On her plan, petitioner showed that she would realize a cumulative net profit of $ 2,400 after 5 years. However, because she made a $ 10,000 error in arithmetic, she actually projected a cumulative loss for such period.↩