T.C. Memo. 2000-83

UNITED STATES TAX COURT

CHUNG UI KIM AND OK HUI KIM, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12880-98.                    Filed March 13, 2000.

<u>Donald L. Field, Jr.</u>, for petitioners.

<u>Allan D. Hill</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  Respondent determined the following
deficiencies in and penalties on petitioners' Federal income
taxes:

| Year | Deficiency | Sec. 6663(a) Penalty |
|------|-----------|----------------------|
| 1993 | $174,815 | $131,111 |
| 1994 | 156,263 | 117,057 |
| 1995 | 179,928 | 134,945 |

After concessions, we must determine the following issues:

(1) Whether respondent's bank deposit analyses correctly determined petitioners' unreported gross receipts during 1993, 1994, and 1995 in the amounts of $721,408,[1] $735,207, and $542,641, respectively. We hold that they did.

(2) Whether petitioners are liable for penalties on their 1993, 1994, and 1995 tax for fraud pursuant to section 6663(a). We hold they are. (Accordingly, we do not decide respondent's alternative determination that petitioners are liable for penalties for negligence pursuant to section 6662(a).)[2]

Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. Dollar amounts are rounded to the nearest dollar.

## FINDINGS OF FACT

Some of the facts were stipulated. The stipulation of facts and the exhibits submitted therewith are incorporated herein by reference. When the petition was filed, petitioners Chung Ui Kim

---

[1]Respondent determined that petitioners had $791,408 of unreported gross receipts for 1993 but subsequently conceded that $70,000 was from a nontaxable source.

[2]Respondent also determined, and we agree, that for the years in issue, certain computational adjustments should be made, which would: (1) Reduce petitioners' itemized deductions, (2) increase petitioners' self-employment tax liability, and (3) reduce petitioners' claimed exemptions. These are mathematical adjustments that the parties can make in their Rule 155 computation.

(Chung Kim) and Ok Hui Kim (Ok Kim) resided in Hayward, California.

Petitioners were married in Korea during 1970 and immigrated to the United States in 1973. Petitioners have been U.S. residents from that date through the years at issue.

Chung Kim, a high school graduate, worked in Korea in the Korean movie industry and then as an artist in the United States. Ok Kim, also a high school graduate, worked as a dance instructor in Korea and then as a typist in the United States. In 1977, petitioners opened a retail store of approximately 800 square feet on O'Farrell Street in San Francisco, California.

In 1992, petitioners relocated their store to a 3,000-square-foot retail space on Geary Boulevard in San Francisco. During the years at issue, petitioners operated their store as a sole proprietorship named Top Blue Jeans/TBJ Collection (TBJ) and sold merchandise at retail including clothing, cosmetics, jewelry, leather goods, and other items of personal property.

Petitioners filed joint 1993, 1994, and 1995 Federal income tax returns (Form 1040). The only source of taxable income reported on those returns was gross receipts from TBJ of $698,632, $846,030, and $1,032,759, respectively. Petitioners initially reported costs of goods sold for the respective years of $506,960, $625,553, and $765,298. The parties stipulated that petitioners' costs of goods sold were $859,563, $973,460, and $866,771, respectively.

Petitioners maintained two banking accounts: A personal account in their joint names and a business banking account in the name of TBJ Collections and Chung Kim, both with the California Korea Bank. The net deposits into these two accounts for 1993, 1994, and 1995 were $1,490,039, $1,481,237, and $1,575,400, respectively.[3]

OPINION

Issue 1. Unreported Income

When respondent audited petitioners' 1993, 1994, and 1995 income tax returns in 1996, petitioners failed to provide any accounting records from which a determination could be made of TBJ's gross receipts. Respondent therefore performed a bank deposits analysis, under which he determined that petitioners had made deposits in excess of the reported gross receipts as follows:

| Year | Amount |
|------|--------|
| 1993 | [1]$791,408 |
| 1994 | 735,207 |
| 1995 | 542,641 |

[1]Respondent concedes that this amount should be decreased to $721,408.

In cases where taxpayers have not maintained business

---

[3]The net figures account for amounts attributable to transfers, sales taxes, returned checks, and paid item reversals.

records or where their business records are inadequate, the Courts have authorized the Commissioner to use the bank deposits method to compute income. See Factor v. Commissioner, 281 F.2d 100, 116 (9th Cir. 1960), affg. T.C. Memo. 1958-94; DiLeo v. Commissioner, 96 T.C. 858 (1991), affd. 959 F.2d 16 (2d Cir. 1992). Bank deposits are prima facie evidence of income. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). The burden, generally, is on the taxpayers to show that the bank deposits are derived from nontaxable sources. See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Reaves v. Commissioner, 31 T.C. 690, 718 (1958), affd. 295 F.2d 336 (5th Cir. 1961); Nicholson v. Commissioner, T.C. Memo. 1993-183.

Petitioners admit that the amounts determined to be unreported income in the notice of deficiency were deposited into their banking accounts. However, petitioners contend that these excess deposits represent inheritance and loan proceeds received from various relatives which were deposited into the TBJ bank account. Petitioners assert that they needed these funds to cover expenses associated with the relocation of their store to a larger retail space in 1992.

Petitioners assert that they received nontaxable funds from the following sources and in the following years:

| 1993 | U.S. Dollars | Korean Won Equivalent |
|------|-------------|----------------------|
| Bok Rye Kim | $440,324 | [1]350 million |
| Sung Bae Kim | 246,354 | 200 million |
| Ki Soon Yun | 70,000 | |
| Young Ae Hong | 187,676 | 150 million |
| Total: | 944,354 | |

| 1994 | U.S. Dollars | Korean Won Equivalent |
|------|-------------|----------------------|
| Bok Rye Kim | $491,672 | 400 million |
| Sul Ja Kim | 100,000 | |
| Mr. Moon | 20,000 | |
| Il Sup Cha | 184,377 | 150 million |
| Total: | 796,049 | |

[1]Petitioners claim that several of the loans were paid in Korean currency and later converted to U.S. dollars before being deposited into the TBJ account. In these instances, the U.S. dollar amounts represent the agreed conversion value.

a. Nontestifying Lenders

Of these seven individuals, only Bok Rye Kim testified at trial. Petitioners did not explain the absence of the other six, all of whom were relatives of petitioners.[4] We cannot assume that the testimony of absent witnesses would have been favorable to petitioners. Indeed, we infer that it would have been unfavorable. See McKay v. Commissioner, 886 F.2d 1237, 1238 (9th Cir. 1989), affg. 89 T.C. 1063 (1987); Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

_____

[4]At least two of these purported lenders, Ki Soon Yun and Mr. Moon, resided in San Francisco.

Petitioners claim to have received loans from the six nontestifying relatives of an aggregate $808,000.  The only evidence of these loans was documents signed by petitioner Chung Kim purporting to be promissory notes.  These "notes" had no stated interest or repayment date, were not notarized, and were not signed by the purported lenders.  They evidence neither genuine indebtedness nor actual receipt of any loan proceeds by petitioners.

Petitioners presented no evidence as to the source of the funds for such loans, or as to when, or by what means, the funds were transferred.  Petitioners also did not explain why they never made any interest or principal payments on the loans.  Absent any testimony by the named individuals, or any supporting documentary evidence, petitioners have failed to prove the existence of any of the $808,000 in loans alleged to have been made by the non-testifying lenders.

b.   <u>Bok Rye Kim's Testimony</u>

Bok Rye Kim (Bok Kim), who is Chung Kim's niece, testified that she transferred an inheritance of 350 million won (approximately $440,000) to petitioners in incremental amounts between the end of 1992 and the end of 1993.  She testified further that she lent petitioners 400 million won (approximately $492,000) which she transferred to them incrementally between early 1993 and 1994.

Bok Kim testified that she had received an 800 million won inheritance from her father in 1976. She said that her father had designated 350 million won of this inheritance to be delivered to petitioners' son when he grew up. She claims that she held on to these funds for 16 years until petitioners asked that the money be transferred to them in 1992.

Bok Kim admitted that she did not have any written records that could demonstrate that she ever had possession of the inheritance money that she allegedly transferred to petitioners. She explained that she never put the funds into a Korean financial institution but rather used the funds to make private loans and real estate investments. She claimed that as the private loans were repaid, she kept the money in a "secret place" at her house. She testified that she received interest on the private loans, but she said that she neither transferred such earned interest to Chung Kim's son nor reported the interest to tax authorities. She had no explanation for the lack of documentary evidence of the alleged real estate investments.

Bok Kim could not recall the dates or total number of occasions when she transferred either the 350 million won inheritance or the 400 million won loan. Neither petitioners nor Bok Kim had any records showing that she made any transfers of the money to Chung Kim during 1993 and 1994. Petitioners and Bok Kim explained that there were no records of the transfers because

they had engaged in an elaborate scheme to transfer the funds without the knowledge of the Korean and U.S. customs and tax authorities.[5] Bok Kim testified that she repeatedly delivered small amounts of Korean currency to Sung Bae Kim, an airline employee whom she identified as Ok Kim's younger brother.[6] According to Bok Kim, the airline employee would arrange for the conversion of the won to U.S. currency and for Korean tourists, unknown to either Bok Kim or petitioners, to deliver the funds to petitioner Chung Kim at his store.[7] Bok Kim could not recall the precise amounts of money she transferred on each occasion but believed the amounts to be in the range of 5 to 7 million Korean won (approximately 5,000 to 9,000 U.S. dollars).[8]

We find that Bok Kim's testimony lacks credibility, is inconsistent with the record in this case, and does not credibly establish a nontaxable source for the unexplained deposits. Under the circumstances, we are not required to, and we do not,

---

[5]Chung Kim testified that he did not request a bank wire transfer because it is "illegal" to take out more than $10,000 from Korea. He also stated that he wanted to avoid any "tax consequences" such a transfer would entail for either him or his niece.

[6]Chung Kim identified Sung Bae Kim as his wife's nephew, not her brother. Sung Bae Kim did not testify.

[7]Neither Bok Kim nor petitioner identified the names of any of the individuals who allegedly delivered the funds to Mr. Kim.

[8]Despite allegedly transferring nearly all of her father's substantial estate with no true expectation of repayment, Bok Kim also testified that she had come to Court to help her uncle "because it's not like I had done much for him before."

rely on Bok Kim's testimony to support petitioners' position herein.  See Ruark v. Commissioner, 449 F.2d 311, 312 (9th Cir. 1971), affg. T.C. Memo. 1969-48; Tokarski v. Commissioner, 87 T.C. at 77.

Furthermore, petitioners have failed to introduce any evidence whatsoever relating to the existence of any nontaxable sources for the $542,641 in unexplained funds deposited into their banking accounts in 1995.  Petitioners make no claim that they held on to loan and inheritance proceeds received in 1993 and 1994 before depositing them in 1995.[9]  Additionally, given the cost of goods sold as stipulated in this case, petitioners would have had to have been selling their inventory at below cost in 1993 and 1994 if TBJ's gross receipts were as reported.  Yet Chung Kim testified that he marked up the merchandise by almost 25 percent.

Petitioners offer no credible evidence that any of the unexplained deposits represent loan and inheritance proceeds. Hence, petitioners have not disproved that the excess deposits originate from a taxable source as respondent determined. Accordingly, respondent's determinations, after concessions, are sustained.

---

[9]Chung Kim testified that he never left the loan and inheritance proceeds in his safe but rather deposited the funds within 3 days of delivery.  Additionally, TBJ's balance sheet for Dec. 31, 1994, reflects cash on hand and in the bank of only $9,663.

Issue 2:  Fraud Penalty

Respondent has determined that petitioners are liable for fraud penalties under section 6663(a) for 1993, 1994, and 1995. A taxpayer is liable for a 75-percent penalty on the part of an underpayment that is attributable to fraud.  See secs. 6653(b), 6663(a).

Respondent must prove fraud by clear and convincing evidence.  See sec. 7454(a); Rule 142(b); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983); Drabiuk v. Commissioner, T.C. Memo. 1995-260.  In order to carry his burden as to fraud, respondent must prove:  (1) Petitioners underpaid their tax in each year, and (2) some part of each underpayment was due to fraud.  See Laurins v. Commissioner, 889 F.2d 910, 913 (9th Cir. 1989), affg. Norman v. Commissioner, T.C. Memo. 1987-265; Beddow v. Commissioner, T.C. Memo. 1999-232; Roots v. Commissioner, T.C. Memo. 1997-187; Lee v. Commissioner, T.C. Memo. 1995-597.

   a.   Underpayment of Tax

Respondent can satisfy his burden of proving the first prong of the fraud test; i.e., an underpayment, when the allegations of fraud are intertwined with unreported and reconstructed income in one of two ways.  Respondent may prove an underpayment by proving a likely source of the unreported income.  See Holland v. United States, 348 U.S. 121 (1954); Parks v. Commissioner, 94 T.C. 654, 661 (1990).  Alternatively, where the taxpayer alleges a

nontaxable source, respondent may satisfy his burden by disproving the nontaxable source so alleged. See United States v. Massei, 355 U.S. 595 (1958); Parks v. Commissioner, supra.

We find that respondent has proven by clear and convincing evidence a likely source of the underreported deposits; i.e., that they are income from TBJ's sales. We also find that respondent has disproven, by clear and convincing evidence, the nontaxable source alleged by petitioners. Petitioners' explanation of loans and inheritances from their relatives is implausible and incredible. The first prong is satisfied.

b. Fraudulent Intent

Respondent must prove that some portion of the underpayment was due to fraud. See Professional Servs. v. Commissioner, 79 T.C. 888, 930 (1982).

Fraud is an intentional wrongdoing designed to evade a tax believed to be owing. See United States v. Walton, 909 F.2d 915, 926 (6th Cir. 1990); Miller v. Commissioner, 94 T.C. 316, 332 (1990). The existence of fraud is a question of fact. See King's Court Mobile Home Park v. Commissioner, 98 T.C. 511, 516 (1992). Fraud is never presumed or imputed; it must be established by some independent evidence of fraudulent intent. See Otsuki v. Commissioner, 53 T.C. 96, 106 (1969); Beddow v. Commissioner, supra. Because direct proof of the taxpayer's intent is rarely available, fraud may be proven by circumstantial

evidence and reasonable inferences drawn from the facts. See Spies v. United States, 317 U.S. 492, 499 (1943); Stephenson v. Commissioner, 79 T.C. 995 (1982), affd. per curiam 748 F.2d 331 (6th Cir. 1984); Collins v. Commissioner, T.C. Memo. 1994-409. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. See Otsuki v. Commissioner, supra at 106.

Over the years, the courts have identified a number of objective indicators or "badges" of fraud. See Recklitis v. Commissioner, 91 T.C. 874, 910 (1988); Kish v. Commissioner, T.C. Memo. 1998-16. Several badges of fraud are present in this case: (1) Substantially understating income for 3 consecutive years; (2) having inadequate books and records or destroying books and records; (3) providing incomplete and erroneous information to a tax return preparer; (4) providing implausible explanations of behavior; (5) giving false, misleading, and inconsistent testimony at trial, and (6) dealing in large amounts of cash. See Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Meier v. Commissioner, 91 T.C. 273, 297-298 (1988); Lee v. Commissioner, T.C. Memo. 1995-597.

Although no single factor is necessarily sufficient to establish fraud, the combination of a number of factors constitutes persuasive evidence. See Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo.

1982-603; Beddow v. Commissioner, supra.

Petitioners' income was consistently underreported, and in the aggregate petitioners failed to report over $2 million of TBJ's sales from 1993 through 1995. This is a substantial sum, especially in light of the fact that petitioners reported adjusted gross income for those 3 years in the amounts of only $22,022, $38,357 and $46,388. Additionally, petitioners were unable or unwilling to produce daily sales records for their accountant, the IRS, or the Court. Neither petitioners' accountant nor anyone else ever audited petitioners' business, and their accountant never reviewed any of TBJ's daily cash register tapes.[10]

Moreover, petitioners' explanations of having received substantial cash inheritances and loans from U.S. and Korean relatives are highly implausible and wholly lacking in credibility. Petitioners testified that they did not fraudulently conceal TBJ's sales proceeds from U.S. tax authorities but instead colluded with their Korean relatives to conceal the conversion and transfer of nearly 2 million dollars worth of Korean currency from U.S. and Korean customs agents. Yet petitioners could produce no single piece of documentary evidence that their Korean relatives ever possessed these funds

---

[10]Petitioners' accountant testified that Chung Kim reported TBJ's cash receipts to him orally.

or made any such conversions or transfers. Such testimony is indicative of fraud on the part of petitioners.

Based on our review of the record, we conclude that respondent has met his burden of proving fraud for each of the relevant years. Petitioners' clear pattern of underreporting taxable income for 3 years, coupled with the lack of recordkeeping and attempts to conceal a substantial amount of cash transactions, leads to a particularly strong inference of fraud. See Lee v. Commissioner, T.C. Memo. 1995-597.

Respondent has proven by clear and convincing evidence an underpayment of tax for 1993, 1994, and 1995 and that some portion of the underpayment was attributable to fraud. Petitioners, on the other hand, have failed to show that any portion of their underpayment was not due to fraud. Accordingly, we sustain respondent's determination that petitioners are liable for the penalty for fraud under section 6663(a) for all the years under consideration.

To reflect the foregoing and concessions,

Decision will be entered

under Rule 155.